MOOG INDUSTRIES, Inc., Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 15370.

United States Court of Appeals
Eighth Circuit.

Nov. 5, 1956.

Rehearing Denied Nov. 29, 1956.

44

Malcolm I. Frank, St. Louis, Mo. (Bernard Mellitz, St. Louis, Mo., James W. Cassedy, Washington, D. C., and Mellitz & Frank, St. Louis, Mo., were with him on the brief), for petitioner.

James E. Corkey, Atty., Federal Trade Commission, Washington, D. C. (Earl W. Kintner, Gen. Counsel, and Robert B. Dawkins, Asst. Gen. Counsel, and Janet D. Saxon, Atty., Federal Trade Commission, Washington, D. C., were with him on the brief), for respondent.

Before SANBORN, JOHNSEN and WHITTAKER, Circuit Judges.

WHITTAKER, Circuit Judge.

The Federal Trade Commission, after hearings, found that petitioner, which manufactures and sells automobile repair or replacement parts in interstate commerce, has granted to its customers, at the end of each annual period, a retroactive volume rebate consisting of a flat, graded, percentage of the aggregate dollar volume of their respective purchases in the preceding year, and that this practice has discriminated in price between different purchasers of like grades and qualities of its products, and that the effect "may be to substantially lessen, injure, destroy or prevent competition between customers receiving the benefit of said discriminations and the customers who do not receive the benefit of such dis-

criminations", and it concluded that such discriminations violated Section 2(a) of the Clayton Act, 38 Stat. 730, as amended by Section 1 of the Robinson-Patman Act, 49 Stat. 1526, 15 U.S.C.A. § 13, which, in pertinent part, provides:

"(a) It shall be unlawful for any person engaged in commerce * * *, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing contained in sections 12, 13, 14–21, and 22–27 of this title shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered * * *."

The Commission accordingly issued an order prohibiting petitioner from discriminating in price:

"By selling to any one purchaser at net prices higher than the net prices charged to any other purchaser who, in fact, competes with the purchaser paying a higher price in the resale and distribution of (respondent's) petitioner's products."

Aggrieved by that order, petitioner has brought the matter here upon its petition for review, and seeks reversal upon the grounds (1) that the Commission's findings and conclusions are erroneous, and are not supported by any substantial evidence, (2) that the Commission's order is broader than its powers to make, and (3) of claimed procedural errors of the Commission.

It is conceded by the parties that (a) petitioner sold and distributed its products in interstate commerce, (b) they were sold for resale within the United States, (c) petitioner's *base price* for its products has been the same to all its customers, (d) petitioner promulgated, years ago, and has since universally used, the questioned annual retroactive volume rebate plan, and (e) the plan allows a volume discount, or rebate, to petitioner's customers, computed, at the end of each annual period of purchases, upon a flat, graded, percentage of the aggregate dollar volume of their respective purchases made in the preceding year. Petitioner practically concedes, at least does not seriously dispute, as, indeed, it could not, that its rebate plan has resulted in higher prices to some than to others of its customers—the extent of the differentials depending upon the aggregate dollar volume of their respective purchases in the preceding year.

The essential facts found by the Commission are that petitioner manufactures at St. Louis, and sells to jobbers, whom it calls distributors, and to "group buying" associations throughout the country, thousands of different types and sizes of replacement parts—all of the same high or first grade and quality—for many makes, models and ages of automobiles and trucks. These jobbers and "group" buyers are not granted exclusive territories by petitioner, and two or more of them do business in each trade area, and, in turn, sell these products to the same types of customers—repair shops, garages, service stations, fleet accounts, car dealers, other jobbers, and over-the-counter—as competitors. For pricing and volume rebate purposes, petitioner has classified its products into three lines, namely (1) leaf spring line, including coil springs and chassis parts, (2) coil action line, and (3) piston ring line. It enters into contracts, which it calls franchise agreements, with its jobber and "group buying" purchasers. Those contracts contain an annual cumulative rebate schedule, for each of the three lines of

products, as set forth in the margin.[1] It will be seen from those schedules that a different volume rebate is applicable to each line; that the coil action line rebate ranged from 5% on annual net purchases of $1,000, to 19% on annual net purchases of $27,500 or more; that the piston ring line rebate ranged from 2% on annual net purchases of $2,000, to 20% on annual net purchases of $30,000 or more, and the leaf spring line rebate ranged from 3% on annual net purchases of $2,000, to 13% on annual net purchases of $35,000 or more.

In addition to those rebates, petitioner allowed a 10% warehousing commission to those of its customers who resold its products to other jobbers whom it had approved, provided the combined earnings from the volume rebate and the redistributing commission could not exceed the maximum volume rebate for that line. Petitioner also allowed its customers a cash discount of 2% if payment be made by the 10th day of the month following order.

In the sample year 1949, petitioner had franchise agreements with 15 group buying organizations or associations having numerous members, many of whom operated in the same trading area. The group buying was done substantially as follows: A member of a group would forward his orders directly to petitioner, with a copy to the group's office, or through the group's office. Petitioner would then ship the goods directly to the member, but would bill the group's office which would pay the bills and the member would later reimburse the group's office. At the end of each year, petitioner totaled the combined purchas-

---

1. These rebate schedules were applicable to the sample year 1949.

Coil Action Line

| Net Purchases During Each Fiscal Year | Retroactive Rebate (Percent) | Net Purchases During Each Fiscal Year | Retroactive Rebate (Percent) |
|---|---|---|---|
| Under $1,000 | None | $15,000 to $17,499 | 14 |
| $1,000 to $4,999 | 5 | $17,500 to $19,999 | 15 |
| $5,000 to $7,499 | 7½ | $20,000 to $22,499 | 16 |
| $7,500 to $9,999 | 9 | $22,500 to $24,999 | 17 |
| $10,000 to $12,499 | 10 | $25,000 to $27,499 | 18 |
| $12,500 to $14,999 | 12 | $27,500 and over | 19 |

Piston Ring Line

| Net Purchases During Each Fiscal Year | Retroactive Rebate (Percent) | Net Purchases During Each Fiscal Year | Retroactive Rebate (Percent) |
|---|---|---|---|
| Under $2,000 | None | $9,000 to $9,999 | 13 |
| $2,000 to $2,999 | 2 | $10,000 to $11,999 | 14 |
| $3,000 to $3,999 | 5 | $12,000 to $14,999 | 15 |
| $4,000 to $4,999 | 7 | $15,000 to $17,999 | 16 |
| $5,000 to $5,999 | 9 | $18,000 to $20,999 | 17 |
| $6,000 to $6,999 | 10 | $21,000 to $24,999 | 18 |
| $7,000 to $7,999 | 11 | $25,000 to $29,999 | 19 |
| $8,000 to $8,999 | 12 | $30,000 and over | 20 |

Beginning July 1, 1949, petitioner introduced the following schedule applicable to its leaf spring line.

| Net Purchases During Each Fiscal Year | Retroactive Rebate (Percent) | Net Purchases During Each Fiscal Year | Retroactive Rebate (Percent) |
|---|---|---|---|
| Under $2,000 | None | $8,000 to $9,999 | 8 |
| $2,000 to $2,999 | 3 | $10,000 to $14,999 | 9 |
| $3,000 to $3,999 | 4 | $15,000 to $19,999 | 10 |
| $4,000 to $4,999 | 5 | $20,000 to $27,499 | 11 |
| $5,000 to $5,999 | 6 | $27,500 to $34,999 | 12 |
| $6,000 to $7,999 | 7 | $35,000 and over | 13 |

es by all members of the group and paid a rebate, in the scheduled percentage applicable to the total of those combined purchases, to the group's office, which, in turn, distributed the rebate to its members on the basis of the amount of their respective purchases.

The Commission found that these group buying associations were "in reality bookkeeping devices for the collection of rebates, discounts and allowances received from sellers on purchases made by its jobber members", and that such jobber members "in fact, purchased their requirements of petitioner's products directly from petitioner, and at the same time received a more favorable price or higher rebate based upon the combined purchases of all the members." This finding is not here challenged by petitioner.

Though the fact that petitioner's rebate plan has resulted in price differentials between its customers is not here, and, we think, could not be, in serious dispute, two simple illustrations—typical of many shown by the evidence—will demonstrate how, and to what extent, it has done so, and may aid general understanding of points to follow.

First, the Commission found that in 1949 petitioner had approximately 1,200 purchasers of its coil action line, but 793, or nearly two thirds of them, received no rebate and only 407, or about one third of them, received a rebate, and 352 of those 407 received a rebate of only 5%, while others, in smaller numbers, received rebates ranging from 7½% to 19%, as illustrated by the tabulation in the margin.[2]

Second, the evidence shows, and the Commission found that petitioner sold its leaf spring line to six customers in Dallas, all of whom were in competition with each other in the resale of those products, four of whom purchased through group buying organizations and received rebates from petitioner ranging from 12% to 15%, but the fifth, who was not a member of a "group", received no rebate, because his aggregate annual purchases were not sufficient, and the sixth, who was the largest purchaser of the six, but not a member of a group, received a rebate of 7.29%, of the dollar amount of its purchases in the preceding year.

That these rebates were substantial is shown by the Commission's finding that they amounted, on the coil action line, to $163,392.66 in 1947, to $203,478.53 in 1948, and to $106,255.91 in 1949, and, on the piston ring line, they amounted to $57,561.89 in 1947, to $21,011.19 in 1948, and to $22,380.88 in 1949, and on the leaf spring line, they amounted to in excess of $81,000 in 1950.

These illustrations demonstrate that petitioner's cumulative annual rebate plan has resulted in general, widespread and substantial price differentials between its customers.

We have no issue here respecting justification of these price differentials, as petitioner does not contend on this review that it has justified the different prices by any showing of "differences in the cost of manufacture, sale or delivery",

2.

| Net Purchases | Rebate | Number of Customers | Average Annual Purchases |
|---|---|---|---|
| Under $1,000 | None | 793 | |
| $ 1,000 to 4,999 | 5% | 352 | $ 1,911 |
| 5,000 to 7,499 | 7½% | 27 | 5,499 |
| 7,500 to 9,999 | 9% | 4 | 8,372 |
| 10,000 to 12,499 | 10% | 6 | 10,660 |
| 12,500 to 14,999 | 12% | 4 | 13,667 |
| 15,000 to 17,499 | 14% | 5 | 9,277 |
| 17,500 to 19,999 | 15% | 2 | 18,735 |
| 20,000 to 22,499 | 16% | 0 | ...... |
| 22,500 to 24,999 | 17% | 1 | 23,444 |
| 25,000 to 27,499 | 18% | 1 | 26,887 |
| 27,500 and over | 19% | 5 | 33,471 |

as indeed it could not, because their source is its rebate system, based, not on the quantities or other factors involved in any particular sale, but, rather, upon the combined dollar amount of all sales to a purchaser, or to a "group" of which he is a member, made in the preceding year (without any prior commitment to purchase any particular amount), and that system results "inevitably in systematic price discriminations, since the prices * * * bear relation to factors other than actual costs of production or delivery." Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 732, 65 S.Ct. 961, 964, 89 L.Ed. 1320. Cf. Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196.

Petitioner says that its rebates are equally available to all. "Theoretically, these discounts are equally available to all, but functionally they are not", because they embrace the "evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability." Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 42, 68 S. Ct. 822, 826.

■ It has been many times held by the Supreme Court that price differentials, not justified by a showing of differences in the cost of manufacture, sale or delivery, become price discriminations and are prohibited by the Robinson-Patman Act if they may substantially lessen, injure, destroy or prevent competition, Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 43, 68 S.Ct. 822, 826; Federal Trade Commission v. A. E. Staley Co., 324 U.S. 746, 751, 65 S.Ct. 971, 89 L.Ed. 1338; Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 65 S.Ct. 961.

Petitioner's contentions, on the subject of injury to competition, get down to this: That the Commission failed to adduce any evidence that the price discriminations injured its competing purchasers, because it did not show that competing purchasers bought exactly the same, or interchangeable, items at different net prices; and that the Commission merely inferred competitive injury, and that there was no room for such an inference because such would be contrary to the positive testimony of a number of its purchasers, categorically denying that they were injured, and also to the stipulation that all others would so testify if called.

It is true that the evidence did not identify, item by item, the exact parts in any line sold by petitioner to particular purchasers, but only dealt with them by the same lines as they were sold by petitioner. Thus, for example, the evidence does not specifically show whether leaf springs, coil action parts or piston rings sold to a particular purchaser were designed for the same make, model and age automobile as the like products sold to his competitor. On this basis, petitioner argues there is no evidence that it sold the same items to competing purchasers at different net prices. And it argues that although its products "may all be of one grade and quality" the Commission must prove that it sold "interchangeable" items to competing purchasers at different net prices, otherwise they will not "compete", and could not properly be regarded as of "like grade and quality" within the meaning of the act.

Nothing in the statute suggests this, in a case like the present, and petitioner points to no reason or authority that supports it. The cited case of Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972, does not involve the point, and the other cited case, from this circuit, of Boss Manufacturing Co. v. Payne Glove Co., 8 Cir., 71 F.2d 768, compared second grade cloth gloves of inferior materials and workmanship with first grade ones of superior materials and workmanship, and, naturally, held them to be of different grade and quality.

■ We agree with the statement set out at page 157 of the "Report of the Attorney General's National Committee to Study the Anti-Trust Laws", issued March 31, 1955, that "The 'like grade and

quality' concept * * * was designed to serve as one of the necessary rough guides for separating out those commercial transactions insufficiently comparable for price regulation by the statute", and while leaf springs, coil springs or piston rings may not be interchangeable and usable in all makes, models and ages of automobiles, we believe that when such items are sold to competitors in lines, as petitioner has sold them, and when, as here, a discriminatory rebate is paid upon all items in a line, the Commission may properly find that such items are "sufficiently comparable for price regulation by the statute."

The real and substantive answer is that, while leaf springs, coil action parts or piston rings for a Ford sedan of 1947 may be sufficiently different from those for a Chevrolet coach of 1950 that the former could lawfully be sold for *uniform* higher or lower prices than the latter, the question here is not related to uniform different prices for different items, nor, hence, to the like grade and quality concept, because the price discriminations here did not arise from uniform different prices for particular items, but, rather, they arose solely from the cumulative annual rebate plan, which applied to the aggregate dollar volume of all sales in a particular line to a particular purchaser in the preceding year, and, therefore, necessarily discriminated in price as to all items in the line, whether exactly alike and interchangeable or not.

■ While all purchasers did not handle all three of petitioner's complete lines, some of them did, and numerous ones handled two of the lines; and it was shown and found that two or more of petitioner's purchasers did business in each trade area and were, consequently, competitors therein. Through operation of the applicable cumulative annual rebate schedule, some were charged higher prices than others. This constitutes an adequate evidentiary basis to support the Commission's finding that the price discriminations may substantially injure competition.

■ Petitioner sought to offer detailed evidence, on an item by item basis, to show that the leaf springs, coil action parts and piston rings bought by particular purchasers, doing business in the same trade area, were not uniformly for the same make, model and age of automobile, and not exactly alike and interchangeable. Objection was made and sustained on the ground of immateriality, since the parts, though in part for different makes, models and ages of automobiles, were catalogued, priced and sold, and were subject to rebate, as lines. Petitioner complains that this was prejudicial error. We believe that it was not, for all the reasons above stated.

■ Petitioner put on a number of its customers as witnesses, and asked them whether they had been competitively injured by its cumulative annual rebate plan, and each said that he had not been injured, and it was later stipulated by the parties that all of petitioner's other customers would so testify, if called.

Petitioner argues, in connection with its contention that the Commission's findings were based only on nonpermissible inferences, that this uncontradicted testimony by "hardheaded practical businessmen" shows the complete absence of competitive injury to petitioner's customers by its discriminatory prices.

■ The answers are, first, that the Commission's findings were not based upon nonpermissible inferences, but upon proven facts and inferences properly to be drawn therefrom, and, second, a number of these witnesses were large buyers or members of groups, and thus received high rebates and were benefitted by the plan, and, third, their answers were conclusions contrary to simple mathematics, which may be illustrated by the example of two competing purchasers in a given trade area, buying petitioner's coil action line. Through one or more orders in a given year, one buys $4,999 worth of those products, and the other buys $27,500 worth (or even $4,999 worth, if through a "group" whose combined purchases in the year aggregate $27,500 or

more). At the end of the year, petitioner will pay the former a rebate of 5% of the aggregate dollar amount of his purchases of $4,999, but will pay the latter a rebate of 19% of the aggregate dollar amount of his (or of his "group's") purchases of $27,500 (which, in either case, of course, includes the first $4,999 of his purchases) and, thus, on the first $4,999 of the purchases, the former gets a rebate of $249.81, while the latter gets a rebate of $949.81. A witness cannot be allowed by conclusion to deny a mathematical fact, and all the testimony of these jobbers, on this score, amounts to—if they understood the facts—is that they are not objecting.

■ The Commission was not required to show that petitioner's rebate system has, in fact, adversely affected competition. The language—in the "effect" clause of the statute—is *"may be* substantially to lessen competition * * *." (Italics supplied.) The Supreme Court has repeatedly held that Section 2(a) of the Act does not require a finding that the discriminations in price *have in fact* had an adverse effect on competition. Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 738, 742, 65 S.Ct. 961, 89 L.Ed. 1320; Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 46, 68 S.Ct. 822, 92 L.Ed. 1196; Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356, 357, 42 S.Ct. 360, 66 L.Ed. 653. It has also held that "The statute is designed to reach such discriminations 'in their incipiency,' before the harm to competition is effected. It is enough that they 'may' have the prescribed effect." Corn Products case, 324 U.S. at page 738, 65 S.Ct. at page 967.

The proper test of injury to competition has been phrased in various ways. In the Corn Products case, 324 U.S. at page 738, 65 S.Ct. at page 967, the Court stated, following the Standard Fashion case, "the use of the word 'may' was not to prohibit discriminations having 'the mere possibility' of those consequences, but to reach those which would probably have the defined effect on competition."

Later, in the Corn Products case, 324 U.S. at page 742, 65 S.Ct. at page 969, the Court declared, "As we have said, the statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable *possibility* that they 'may' have such an effect." (Italics supplied.) The latter passage was repeated in the Morton Salt case, 334 U.S. at page 46, 68 S.Ct. at page 828, although with the qualification that it "is to be read also in the light of" the statement on page 738 of 324 U.S. (65 S.Ct. 967) of the Corn Products case (334 U.S. at page 46, note 14, 68 S.Ct. at page 828, note 14).

Many of petitioner's customers testified that their business is keenly competitive and consists of the sale of thousands of items at small margins of profit, and that it is necessary to acquire goods at the lowest available price to be competitive, and those who received these rebates testified that these rebates were very important to them, and some testified that the rebates were more important than the 2% cash discount allowed by petitioner, of which all of petitioner's customers consistently took advantage. One, who ranked third or fourth in size in the city of Dallas, testified that his over-all net profit ran less than 4%.

■ With competition so keen, margins so small and over-all net profits so low, it was clearly open to the Commission to find that rebates denied to some purchasers (well more than half in all lines) but granted to others, ranging up to 19%, may probably result in substantial injury to competition.

■ While many of petitioner's customers handled numerous lines, and were not dependent for financial success upon profits from petitioner's lines alone, yet the Commission, in determining the reasonable probability of injury to competition, was entitled to take account of the effect of rebates from petitioner's products upon their businesses, for the Supreme Court points out in the Morton Salt case, 334 U.S. at page 49, 68 S.Ct. at page 829:

"There are many articles in a grocery store that, considered separately, are comparatively small parts of a merchant's stock. Congress intended to protect the merchant from competitive injury attributable to discriminatory prices on any or all goods sold in interstate commerce, whether the particular goods constituted a major or minor portion of his stock. Since a grocery store consists of many comparatively small articles, there is no possible way effectively to protect a grocer from discriminatory prices except by applying the prohibitions of the Act to each individual article in the store."

██ For all of the foregoing reasons, we hold that the Commission's finding that petitioner has discriminated in price between different purchasers of like grades and qualities of products and that the effect may be substantially to lessen, injure, destroy or prevent competition, was supported by substantial evidence.

Petitioner's next contention is that the Commission's order was too broad, in that it prohibits all price differences and, hence, prohibits conduct which is not unlawful, and, in consequence, denies petitioner the right to participate in lawful competition; and in that it is not, but should be, limited to the secondary level of competition, and in that it should not have included the phrase "piston rings and other related items."

This order is substantially the same as the one approved by the Supreme Court in Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 72 S.Ct. 800, 804, 96 L.Ed. 1081. It was argued in that case that the failure to include in the order provisos excepting from its prohibitions those differentials which merely make allowances for differences in cost of manufacture, sale and delivery, or which are made in good faith to meet an equally low price of a competitor, amounted, in effect, to a prohibition against lawful competitive conduct. But the Supreme Court rejected this contention, saying:

" * * * we think the provisos are necessarily implicit in every order issued under the authority of the Act, just as if the order set them out *in extenso*. Although previous Commission orders have included these provisos, they gained no force by that inclusion. Their absence cannot preclude the seller from differentiating in price in a new competitive situation involving different circumstances where it can justify the discrimination in accordance with the statutory provisos."

██ Thus, the provisos which petitioner would insert are implicitly contained in the order as it stands.

██ The contention that the order should be limited to the secondary level of competition, overlooks the fact that the order is so limited. By its terms, the order covers only sales to those who, in fact, compete "in the resale and distribution of respondent's products." This language limits the order to the secondary line of competition.

██ As to petitioner's contention that the order should not have contained the phrase "piston rings and other related items", there was evidence that piston rings were sold to the same type of accounts as petitioner's other lines, and that cumulative annual rebates were paid to their purchasers in accordance with the schedule applicable to those products, and that, under the applicable schedule, rebates were paid to some, but not to other, purchasers of those products, but it is true that the Commission did not segregate piston ring sales and develop the evidence respecting them with the same completeness as in the coil action and leaf spring lines. But the Commission's power is not limited to prohibiting the identical practices which have resulted in illegal price discriminations. It has the authority to prohibit acts of the same type or class as those committed in the past. This was made clear in the Ruberoid case by the statement, 343 U.S. at page 473, 72 S.Ct. at page 803, reading:

"In carrying out this function the Commission is not limited to prohib-

iting the illegal practice in the precise form in which it is found to have existed in the past. If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its roadblock to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity."

■ We cannot say that inclusion of the questioned phrase was beyond the Commission's power in these circumstances.

Petitioner's final contentions are that the Commission erred in overruling its motion for a bill of particulars, filed in the pleading stage and renewed at the close of the Commission's evidence, and that the Commission erred in overruling petitioner's motion, made at the conclusion of the Commission's case, for an order requiring the Commission to elect, from the mass of evidence adduced, typical transactions, and areas involved, upon which it would rely, and that the action of the Commission in overruling these motions constitutes a denial of due process, within the meaning of the Fifth Amendment.

■ The answer is that, while the complaint was in the general terms of the statute, it was made apparent on the first day of the hearing that the Commission was relying upon the price discriminatory effect of petitioner's cumulative annual rebate plan as the sole source of the price discriminations found, and petitioner admitted, and still admits, the existence of that rebate plan, and, therefore, and in these circumstances, the denial of petitioner's motions for a bill of particulars was not prejudicial and cannot be said to have constituted a denial of due process. The foregoing is equally applicable to, and conclusive upon, petitioner's contention respecting the overruling of its motion to elect.

There being no prejudicial error, the order of the Commission must be, and it is hereby, affirmed.

Affirmed.