**ATALANTA TRADING CORPORATION,**
a corporation, Petitioner,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 57, Docket 24535.

United States Court of Appeals
Second Circuit.

Argued Jan. 16, 1958.

Decided July 28, 1958.

---

Martin A. Fromer, New York City (I. Martin Leavitt, Washington, D. C., on the brief), for petitioner.

E. K. Elkins, Washington, D. C. (Earl W. Kintner, Gen. Counsel, James E. Corkey, Asst. Gen. Counsel, Washington, D. C., on the brief), for respondent.

Before MEDINA and MOORE, Circuit Judges, and GALSTON, District Judge.

MOORE, Circuit Judge.

This is a petition by Atalanta Trading Corporation (referred to as "Atalanta") to set aside a cease and desist order of the Federal Trade Commission based upon a finding that it had violated Section 2(d) of the Robinson-Patman Act, 15 U.S.C.A. § 13(d), which prohibits a seller from granting promotional or advertising allowances on the sale of a product to one customer unless a proportionally equal allowance on the product is made available to other competing customers.

Atalanta is an established distributor of imported meat products and sea food and conducts its operation in a multistate area. In 1954 it made gross sales of approximately $24,000,000. Although, by stipulation, proof was confined in duration to an eighteen-month period, January 1, 1954 to July 1, 1955, and to metropolitan Philadelphia, Baltimore and Washington, D. C., the Commission found that Atalanta had made no advertising allowances on sea food sold in Washington and no advertising allowances on any products sold in Philadelphia or Baltimore. The proof, therefore, was restricted to meat products sold in the Washington area.

Atalanta's business in this area was insubstantial, representing approximately one per cent of its gross sales. The only business of any consequence was with Giant Food Shopping Center, Inc. (a chain store in Washington, referred to as "Giant") which purchased some $250,000 of Atalanta's products in 1954, and $70,000 of such products in the first six months of 1955. Throughout the period involved, Atalanta made sales of meat products to only three other retailers in the Washington area. These sales were small and isolated, the combined total in 1954 being less than $8,000, and in the first six months of 1955 approximately $1,700.

At no time did Atalanta have a systematic or continual policy of granting advertising allowances. However, in July 1954, through Giant as its only customer, it promoted the sale of its pork shoulder picnics for the Fourth of July holiday and gave to Giant a promotional allowance of $500. No prior sales of this product with or without allowances had been made to any other Washington retailer. Over five months later it made a sale, $600 in total amount, of this product to Shirley Food Co., a food retailer in nearby Alexandria, Virginia.

In December 1954 Atalanta granted a $2,000 allowance to Giant to promote the sales of specially packaged gift-wrapped 2¼ and 5 lb. canned hams with recipe booklets for the Christmas holidays. After this allowance it sold no hams to other Washington retailers. However, over eight months prior thereto, in April 1954, Atalanta had "made one sale of this product, but not gift wrapped," viz., $250 of hams to Sanitary Food Store No. 4, also in Alexandria, Virginia. (Pet.App. 36a.)

These two sales, totaling less than $900, constituted the only sales by Ata-

lanta to other customers in the Washington metropolitan area of meat products on which promotional allowances were granted to Giant. Another advertising allowance of $1,000 given to Giant in May 1955 for the promotion of pre-cooked canned Canadian bacon was also relied upon by the Commission as evidence of a violation, although it found that prior to May 1955 Atalanta's Canadian bacon had been sold raw, smoked and sliced and had never been sold to any Washington retailers, including Giant. On the basis of these three small and isolated transactions the Commission entered a sweeping cease and desist order which places Atalanta in jeopardy of contempt if it hereafter violates Section 2(d) in any fashion in any place in the country.

The complaint, containing the sole charge that Atalanta had violated Section 2(d), was founded upon the allegation that Atalanta had given advertising allowances to "some of its customers" (i. e., Giant) without making said advertising allowances available on proportionally equal terms "to all other customers competing in the sale and distribution of respondent's products." These products were defined as "meat products, principally canned hams," sold "under the trade name 'Unox.' "

The Commission adopted all of the findings made by the hearing examiner except two which contained only conclusions of law. The facts as found, so far as material to the decision, may be considered as virtually undisputed. The legal conclusions to be drawn therefrom, however, present the real problem.

Although the scope of Section 2(d) is yet to be precisely delineated, the decision by the Commissioner here constitutes a radical departure from prior applications of Section 2(d). The Commission has concluded that giving spot promotional allowances on these products, namely, canned hams, pork shoulder picnics and pre-cooked Canadian bacon, requires the seller to offer similar allowances on its entire line of products— here meat products. The Commission stated:

"* * * Section 2(d) is not limited to sales of identical products. That construction would make the section very easy of evasion. It is the real competitive situation which is to be considered. See In the Matter of Luxor, Ltd., 31 F.T.C. 658. Commission Exhibit 7(a) lists the meat products upon which respondent was paying promotional allowances in 1954 and 1955.[1] They were all pork products, namely hams of varying sizes, 'picnics' (pork shoulders), loin roll, cottage butts, and chopped ham. With apparently one exception, they were all sold under the trade name Unox. In the general field of pork products, they were in competition with each other."

The hearing examiner was more terse and dogmatic but reached the identical conclusion, stating that "All of these products were pork, and to the hearing examiner, ham is ham * * *"

We cannot accept the Commission's expansive interpretation of Section 2(d), namely, that after showing a supplier has sold a general line of products in a

1. We do not interpret the citation of Commission Exhibit 7A in the opinion to mean that the Commission impliedly rejected Finding 7 of the Initial Decision by the hearing examiner which found that during the period in question Atalanta made only three advertising allowances—all to Giant. The allowances offered on products listed in Commission Exhibit 7A were not the allowances made the subject of the complaint but were actually price discounts offered to all customers. The allowances given to Giant were over and above these discounts (Transcript of hearing, pp. 29–30). The Commission must have realized the immateriality of this exhibit to a Section 2(d) violation, since a month after the petition to review its order was filed in this court, it deleted *sua sponte* from its opinion its quotation of testimony by Atalanta's Vice-President explaining the purpose of these price discounts. This quotation was originally intended to show the fact that the allowances given to Giant were negotiated.

given area and has granted allowances to only one customer, it is immaterial whether or not a product of like grade and quality to the one on which the allowance was made was ever sold to any other customers in that area.

Section 2(d) provides:

"It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

The crucial issue is the meaning of the term "products or commodities" in the phrases "sale of any products or commodities" and "customers competing in the distribution of such products or commodities."

■ The Commission itself has interpreted "products or commodities" to mean products and commodities "of like grade and quality." The reasonableness of this interpretation has been well stated by Cyrus Austin in his article, "Price Discrimination and Related Problems Under the Robinson-Patman Act" (Rev. Ed. Ann.Law Inst., Nov. 1953) p. 118:

"Section 2(a) prohibits price discrimination 'between different purchasers of commodities of like grade and quality.' This limitation is not contained either in 2(d) or in 2(e). Products which differ to some extent in grade or quality are very commonly competitive at a differential. Nevertheless, since section 2(a) does not regulate the prices charged purchasers of goods of different grade or quality, it is improbable that 2(d)

and 2(e) were intended to have a broader application as to merchandising allowances and services even where such goods are resold in competition. If so construed the result would be to require a manufacturer desiring to launch a promotional campaign for one line or product to extend the promotional benefits to all customers competing in the resale of any other competitive product. The words 'such products or commodities' at the end of Section 2(d) have been construed by the Commission as referring to goods of like grade and quality, and the same limitation will no doubt be read into Section 2(e)."

In Matter of Golf Ball Mfrs. Ass'n, 26 F.T.C. 824, 851, (1938), the underlying factual basis which supported the Commission's finding of a violation was that the golf balls on which no allowances were given were "of like quality" to the golf balls stamped with the label "PGA." Likewise in Henry Rosenfeld, Inc. (F.T.C. Docket No. 6212, decided June 29, 1956), the Commission did not conclude that a supplier had to use as a yardstick for determining the legality of his promotional allowances the entire line of women's wearing apparel; to the contrary it recognized the rights of suppliers to differentiate for purposes of promotional allowances between three separate categories of dresses and concluded with this accurate summation of the law, saying that it "imposes no requirements that a seller give advertising allowances on all his products if he elects to accord them on one or more articles. When granting any promotional payments, however, the law requires that he make them available on proportionally equal terms to other resellers of that article or articles who compete with other recipients of the compensation."

■ Counsel for the Commission argue that all the Commission need show is that a supplier in the general course of his business has given a promotional allowance to one customer and not to others; but as pointed out, *supra*, the

existence of another competing purchaser of a product of like grade and quality must also be shown and proof thereof is an essential part of the Commission's case (Corn Products Refining Co. v. F. T.C., 7 Cir., 1944, 144 F.2d 211, 219, affirmed 324 U.S. 726, 65 S.Ct. 961, 89 L. Ed. 1320). The very term, promotional allowance, implies a product to be promoted. To adopt the Commission's argument would be tantamount to striking out from Section 2(d) the qualifying phrase "competing in the distribution of such products or commodities" and overruling the prior decisions holding that "such products" mean products of like grade and quality.

▆ Once it becomes apparent that the promotional allowances were lawful when viewed in relation to the specific products on which they were given, the Commission cannot convert them into something illegal by saying that these products "were in the general field of pork products" and that therefore any sales of any other products in this general field on which allowances were not made gave rise to violations.[2] To argue that the allowances actually given were not made in respect to particular products would be not only to ignore the fact that the Commission did not and could not from the evidence make such a finding but also to reject the finding adopted by the Commission that the allowances were geared to specific products.[3] The occasion prompting the May

1955 promotion was Giant's 19th Anniversary Sale. Giant solicited Atalanta's participation in this sale. Atalanta agreed to join the sale only upon the condition that Giant promote during this sale its canned Canadian bacon (Transcript of hearing, p. 26). There is nothing in the record to show that any other Atalanta products were promoted in this Anniversary Sale. Therefore, we cannot accept the hearing examiner's inference that the May 1955 allowance was made to promote Atalanta's general line of products.

▆ The grounds of the Commission's decision were that the two promotional allowances given to Giant in 1954 were not offered to any competitor of Giant, and that some competitors of Giant bought a trifling amount of meat products bearing the trade name "Unox" from Atalanta. However, these two facts do not constitute a prima facie violation of Section 2(d). The section does not ban all promotional allowances, nor even all allowances which are "the result of private negotiations." The section was designed to place the vendor of a particular product on a par with all other vendors who compete with him in selling that product. From the customer's viewpoint the product range of the particular supplier is immaterial; his sole concern is to be given an equal opportunity with his competitors to sell the particular product if he elects to carry it.

---

2. No attempt is made by counsel for the Commission to assimilate the facts of this case to those in cases involving quantity discounts on lines of products in violation of Section 2(a), and in light of the fact that in those cases the issue is "not related * * * to the like grade and quality concept" (Moog Industries, Inc., v. F. T. C., 8 Cir., 1956, 238 F.2d 43, 50, affirmed on other grounds 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370), it is difficult to see how such an argument could be raised.

3. Finding 12 of the Initial Decision reads: " * * * The payment of $500 to Giant on July 15, 1954, was, according to testimony, for 'pork shoulder picnics,' although the invoice was for 'hams.'

Whatever it was, the same product was six months later sold to a competitor of Giant's, Shirley Stores, which received no advertising allowance. The second payment of $2,000 to Giant on December 28, 1954, was to promote gift wrapped 2¼ and 5 lb. hams, and the same product was sold in the following [preceding] April to a nonrecipient customer, but without the gift wrapping. The third payment of $1,000 to Giant on May 17, 1955, was made to promote respondent's products generally, with particular emphasis on a new product, a 4 lb. tin of Canadian bacon, cooked and ready to eat. Canadian bacon had previously been sold raw, smoked, and sliced. None of this was sold by respondent to any of its customers, who competed with Giant."

The test of products of like grade and quality was evolved to prevent emasculation of the section by a supplier's making artificial distinctions in his product but this does not mean that all distinctions are to be disregarded. Such a holding would lead to the conclusion that all articles of food are competitive, each with the other—an obvious absurdity. Merely because various articles of food are derived from a common source (in this case, the pig), should not force the vendor of a broad line of such products to market or promote all simultaneously and in an identical fashion. The dietetic habits of the consuming public are not to be controlled by judicial fiat.

The Commission in enforcing Section 2(d) is not charged with curbing a monopoly and *a fortiori* is not concerned with determining a relevant market. To make interchangeability of products the test, however, would expand Section 2(d) into a device to regulate the entire business of a supplier. The fact that cellophane wrappings are more or less interchangeable with other flexible wrappings [4] would not compel a supplier of such materials to give promotional allowances on every type of flexible wrapping he sells if he has given such an allowance on one type. Prior to the decision of the Commission, here, it has never been intimated that the presence of cross-elasticity of demand between various products could give rise to a violation of Section 2(d).[5]

The alternative ground of the Commission's decision, namely, that the same two products on which Giant received allowances were sold to competitors of Giant with no offers of allowances, is also unsound because it ignores the fact that the two sales to the competitors did not occur even closely within the same time periods as the sales of those products to Giant. The Christmas gift-wrapped ham on which the December 1954 promotion allowance was given to Giant had been sold in a small quantity and in an ordinary container eight months previously to Sanitary Food Store No. 4 in Virginia, and some pork shoulder picnics on which the July 1954 promotional allowance was given to Giant were sold to Shirley Food Company in the following December. The record is devoid of any evidence of other sales of these products to these, or any other, customers in competition with Giant.

The Commission's conclusion that Atalanta violated the law is based on the finding that "on at least two occasions, substantially identical products were sold to competitors of Giant within six or eight months of the date of the sales to Giant under the allowances complained of." However, as to the December 1954 promotional allowance no subsequent sales of that product with or without such allowances were shown. The Commission apparently assumed without discussion that if a supplier wishes to grant promotional allowances in a given territory, he must elect to do so upon the first sale made. Under the Commission's rationale any prior sale without an allowance would make a subsequent sale with an allowance unlawful. By the same token any allowance given on the first sale could never be adjusted to meet competition. Such a rigid application of Section 2(d) would stifle rather than encourage competition and have the practical effect of outlawing all promotional allowances. Had Congress so desired, Section 2(d) would have read far differently than it does.

---

4. See United States v. E. I. Du Pont De Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264.

5. As a matter of fact, here there would appear to be little cross-elasticity of demand among the products on which the allowances were given. Simply because bacon and pork come from a common source does not mean they are of like grade and quality. There is no showing that they are in the same price range; few people eat bacon for dinner and probably even fewer eat roast pork for breakfast. Similarly pork shoulder meat and ham are two different cuts and price-wise are not competitive (see Comm.Exh. 7A and 7B).

As to the product on which the July 1954 promotional allowance was made the Commission concluded that a $631 sale of the same product made more than five months later, constituted a violation. Again the flaw in the Commission's decision is that the terms of an initial sale in a given territory would freeze the supplier into an immutable position. While it is true that the sale on which the allowance was not made occurred after the July 1954 promotional allowance rather than preceding it, it does not follow that without any time limitation whatsoever the supplier was irrevocably committed upon making the first sale to hold open the same promotional allowance to all other prospective purchasers or to refuse to deal with them. The Commission considered it immaterial whether the subsequent sale followed the promotion allowance by a matter of weeks or months. However, the time interval is a determining factor. No other competing customer was deprived of the Fourth of July allowance because there was none. Nor is there any claim made by the Commission that when the December 1954 sale to Shirley Food Co. (negligible in amount) was made that Atalanta gave any other competitor any preference by allowance or otherwise. The purpose of Section 2(d) is to give equal opportunities to competing merchants, who acquire products for re-sale. There is no proof that Atalanta placed the customers named by the Commission under competitive disadvantage because of discriminatory merchandising practices. Certainly by December 1954 Atalanta could market pork shoulder picnics free from any restraint placed upon it by the July 1954 promotional allowance.

Assuming the validity of dispensing with proof of actual competitive injury,

to hold that Section 2(d) has been violated in the face of a record revealing that the promotional allowances could not possibly have had any discriminatory effects would establish an inflexible rule at odds with the basic concept of free competition. The two trivial sales isolated in time by at least five months from the substantial sales on which the allowances were given do not violate either the letter or the spirit of Section 2(d).[6]

Hence it is unnecessary to pass upon the issue which divided the court in Simplicity Pattern Co. v. F. T. C., D.C. Cir., 258 F.2d 673, in interpreting Section 2(e), viz., the validity of the affirmative defense of showing no competitive injury. Compare Judge Burger's views stated in footnote 13 of the majority opinion with those expressed in the dissent of Judge Washington. In the Simplicity Pattern case the existence of purchasers who did not receive "proportionally equal" facilities and who were competitive with the favored purchasers both in point of time and in point of locality was undisputed. Here in point of time no such unfavored competitors existed. Therefore the issue is not whether the discrimination could have caused any competitive injury, but whether any discrimination existed at all. The facts reveal that it did not.

 That each allowance was the result of "a plan tailored exclusively to fit the desires of the two parties negotiating" and therefore could not have been made available on proportionally equal terms does not constitute a *per se* violation of Section 2(d). The mere showing that an allowance could not be offered to another competing purchaser is not the equivalent of proof that there in fact existed another such purchaser who was not offered the allowance.[7] Nothing

6. Prior to the decision under review, the Commission itself recognized that the sales to the unfavored customer must occur within the same approximate time period as the sales to the favored customer. Thus in Kay Windsor Frocks, Inc., 1954, 51 F.T.C. 89, the Commission was careful to demonstrate that a substantial amount of the dress sales to

Franklin Simon on which advertising allowances were given actually occurred within the same period as the sales to R. H. Macy & Co., which received no such allowances.

7. The facts on which the result was based in Chestnut Farms-Chevy Chase Dairy Co. (F.T.C. Docket No. 6465, decidea

in the Robinson-Patman Act imposes upon a supplier an affirmative duty to sell to all potential customers. Absent monopolistic power, a seller may refuse to deal with anyone (Naifeh v. Ronson Art Metal Works, 10 Cir., 1954, 218 F. 2d 202; Chicago Seating Co. v. S. Karpen & Bros., 7 Cir., 1949, 177 F.2d 863). All that the Act requires is that a seller give fair and equal treatment to all those to whom he elects to sell products of like grade and quality.

It was also intimated that the payments given to Giant were actually unlawful price differentials or discounts masquerading as promotional allowances. However, the complaint only charged a violation of Section 2(d) and the record made before the Commission was confined to this single charge. Therefore this question is not in issue. Nor is Giant here charged with a violation of Section 2(f), which prohibits a person from inducing or receiving an unlawful discrimination in price.

One additional question remains. Counsel for the Commission argue that the instant order cannot be set aside because the record before the court does not clearly preclude "the Commission's decision from being justified by a fair estimate of the worth of the testimony of witnesses." Counsel for the Commission concede, as they must that "There was no dispute about the basic facts of this case" (Commission's brief, p. 7). Despite this concession and despite the fact that there was no finding by either the hearing examiner or the Commission that any part of any testimony was discredited, a major portion of the Commission's brief is devoted to an attack on the credibility of the Atalanta's vice-president, the only witness called by the Commission at the hearing. After creating this spurious issue, it is then argued that "the Commission was faced

with the necessity of resolving a conflict in the evidence" and that this court in setting aside the Commission's order would be usurping the function of that administrative agency in resolving such conflicts. As an example of evidence contradicting the testimony of the Commission's only witness, reliance is placed upon an invoice apparently made out by an employee of Giant in connection with the July 1954 advertising allowance of $500. In this invoice the articles promoted were listed as "Unox Hams." From this "evidence" counsel for the Commission conclude not only that the testimony of the Commission's sole witness was not to be believed when he testified that the articles promoted were pork shoulder picnics, but also that the Commission actually discredited his testimony and found that the articles promoted were "Unox Hams." The record does not support this argument. This non-verified extra-judicial declaration purportedly made by an unidentified employee of Giant does not constitute proof of the fact.[3] As against Atalanta, the statement at most could only have been used for impeachment purposes. At the hearing, however, counsel for the Commission apparently considered the hearsay designation of "Unox Hams" to be of such negligible value that they did not use it even for confrontation purposes. Had counsel for the Commission actually entertained any doubts as to whether the products promoted in July 1954 were not pork shoulder picnics but hams, they could have called at the hearing, which was conducted in Washington, D.C., officers of Giant, since they had already investigated that company and had already filed a complaint against it.

Actually it appears that at the close of the testimony by Atalanta's vice-president, both counsel for the Commission and the hearing examiner were satisfied that his testimony spelled out a prima

May 28, 1957), did not require a holding to the contrary, and we do not interpret that decision as purporting to establish such a principle.

3. The hearing examiner received a photostat of this invoice into evidence only upon waiver by Atalanta's counsel of any objection to its admissibility (Transcript of hearing, p. 11). Allowing this invoice to be introduced in no way constituted an acknowledgment that the facts therein stated were accurate.

facie violation of Section 2(d). (Transcript, p. 44.) Of course, the Commission was free to disbelieve any and all testimony. However, even assuming that it did not credit parts of the testimony of Atalanta's vice-president, such rejection could not, contrary to the implied premise of the Commission's counsel, serve as a substitute for direct proof establishing the existence of facts not contained in such testimony.

Counsel for the Commission can argue that the pork shoulder picnics were actually hams only by indulging in speculative inferences upon facts neither found by the administrative tribunal nor established by the record. Such a belated attempt to retry the case serves merely to confuse the issues on appeal.

The argument is also made that because the Commission has a special competence in the field of grocery chain stores, its determination as to whether a given practice violates the Robinson-Patman Act cannot be disturbed. The expertise possessed by an administrative agency, however, does not empower it to rewrite the laws which it has been charged with enforcing. This is the function of Congress.

The petition to set aside the order is granted.