**VALLEY PLYMOUTH, a corporation, Plaintiff,**

v.

**STUDEBAKER–PACKARD CORPORATION, a corporation, Ranchero Motors, Inc., a corporation, and Phil Rauch, Defendants.**

No. 556–61.

United States District Court
S. D. California,
Central Division.
April 12, 1963.

# 609

Gibson, Dunn & Crutcher, by John J. Hanson, Frederic H. Sturdy, Jan Vetter, Los Angeles, Cal., for defendants.

Glenn S. Roberts and Henry Grivi, Los Angeles, Cal., for plaintiff.

CRARY, District Judge.

Plaintiff seeks treble damages for alleged unlawful price discrimination under Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13. Both plaintiff and defendant Ranchero Motors, Inc., hereafter referred to as Ranchero, during the pertinent time here involved, were competing franchised dealers of defendant Studebaker-Packard Corporation, hereafter referred to as Studebaker.

The action involves sales of 1960 model Studebakers. Some 66 sales in varying body styles were made to plaintiff by Studebaker between January 7 and July 11, 1960. Plaintiff had 11 of the 66 cars on hand and unsold on December 31, 1960, when defendant Rauch purchased from defendant Studebaker 351 cars from its factory inventory in South Bend, Indiana, and 67 cars from its Los Angeles zone inventory. All of said cars were 1960 models of varying body styles. The cars were sold by Studebaker to Rauch on the agreement that not more than one-half thereof would be offered for sale in the Los Angeles area. The sale to Rauch took place as of December 31, 1960, following a two-day conference between Rauch and Studebaker in South Bend between Christmas and New Year's, 1960. The purchase price for all of the cars above mentioned, which were sold to Rauch as a "package deal", was approximately $644,000.00.

Defendant Studebaker had reduced the dealers' price of all 1960 models on the last day of said model year by 5% of the list price, as per franchise agreement, and another 5% reduction was announced to dealers on or about September 26, 1960. On November 7, 1960, a further reduction in dealers' prices, between 10 and 13% from the list price, was announced to all dealers, and again on December 8, 1960, an additional reduction was made to dealers on purchases of 1960 model cars in groups of twenty-five. The last mentioned reduction was approximately 15% from the level established on November 7, 1960.

The sale to defendant Ranchero on December 31, 1960, was on the basis of a further price reduction from 25 to 30% below the December 8th prices.

On or about January 18, 1961, Studebaker issued a memorandum supplementing its price memo of December 8, 1960, authorizing purchase of individual cars on the reduced price of December 8th which had quoted a reduction for purchases of twenty-five car lots as mentioned hereinabove.

Plaintiff contends that the Robinson-Patman Act has been violated by defendants by reason of the fact that Studebaker sold its factory and Los Angeles zone inventories to Ranchero without according to plaintiff the right to purchase cars at the same reduced prices of that sale and that said sale to Ranchero constituted unlawful discrimination which substantially lessened competition between plaintiff and Ranchero, who, during the period involved, were competing Studebaker dealers.

Most of the facts in the case have been stipulated to by the parties, as set forth in the Pre-Trial Conference Order filed March 4, 1963, and the amendments thereto filed April 2, 1963. It will be noted that before the sale to Ranchero on December 31, 1960, Studebaker had factory and zone inventories totaling 871 cars and that after the sale to Ranchero Studebaker still had on hand in its various zones throughout the United States other than the Los Angeles zone a total of approximately 453 1960 model cars.

The evidence shows that the 1960 model year was an unusual year for Stude-

baker in that, among other things, its sales totaled only 1.54% of the total car sales for all companies that year as compared to 2.72% of the sales for the year before. It will also be noted that as of October 31st on each of the years 1958–62, inclusive, the total number of Studebaker's car inventories for the previous model year did not exceed 50 except for the year 1960 when its inventory of cars on October 31st of that year was 1387. It also appears from the evidence that in February-March, 1960, when an estimate was made by Studebaker for ordering the material needed for the number of cars expected to be sold during the balance of the 1960 model year, which ended in July of that year, that said estimate was based upon the number of 1959 model cars sold and without consideration of the fact that three of the major car manufacturers were to make compact cars for the 1961 model year. The result of the inaccuracies in estimating the number of cars to be sold between March and July of 1960 was Studebaker's unusually large inventory of 1960 model cars from the date of the end of the 1960 model year in July, 1960, to the sale to Ranchero on December 31, 1960. The issues are specified in the Pre-Trial Order, as follows,

(a) Was there a discrimination in price within the meaning of Section 2(a) of the Robinson-Patman Act?

(b) Were the motor vehicles involved in the transactions which are alleged to have resulted in discrimination in price, "commodities of like grade and quality" within the meaning of Section 2(a) of the Robinson-Patman Act?

(c) Whether the alleged discriminatory sales were within the exceptions embodied in the Fourth Proviso of Section 2(a) of the Robinson-Patman Act.

For a discrimination in price to constitute a violation of the Act involved, the Attorney General's National Committee to Study the Anti-trust Laws states, in its report,

"The prohibitions of the statute presuppose discriminatory treatment of customers in *analogous transactions involving similar goods under comparable market conditions at approximately the same time*. (Emphasis added.) Report, p. 178 (1955).

This rule does not appear to be in controversy. In determining whether the defendants are guilty of price discrimination, the court must consider the two sales here involved, to wit, the first to plaintiff of 66 cars between January 7 and July 11, 1960, and the sale by Studebaker of cars to Ranchero on December 31, 1960, 136 of which were sold by Ranchero in Southern California. In making this determination, two questions present themselves:

1. Were these sales analogous transactions under comparable market conditions at approximately the same time?

2. Did the sales involve cars of like grade and quality or, as the Attorney General's Committee says, "similar goods" ?

■ The court concludes that by reason of the very nature of operation of the automobile industry, which the evidence shows is on the basis of model years running consistently from approximately the fore part of October of each year to the middle of July the following year, and the rapid depreciation and obsolescence of the model for the year past, following the introduction of new models each year, the sales here involved are not analogous transactions under comparable market conditions at approximately the same time. It follows that although the cars involved may be considered of like grade and quality or "similar goods" there was not a failure on the part of Studebaker to give fair and equal treatment to plaintiff and Ranchero in the circumstances. In the case of Atalanta Trading Corp. v. Federal Trade Comm., 2 Cir., 258 F.2d 365, the Federal Trade Commission found petitioner had dis-

criminated in granting promotional sales allowances to certain customers in two sales of meat products (picnic hams and gift wrapped hams) without making proportional equal allowances available to other customers, one of whom made purchases of picnic hams approximately eight months prior to the promotion sale, and the other purchaser who purchased gift wrapped hams in December, 1954, approximately six months after the granting of promotional allowances with respect to this item. At page 372 of its opinion, the court states:

"The Commission considered it immaterial whether the subsequent sale followed the promotion allowance by a matter of weeks or months. However, the time interval is a determining factor."

The court, in the Atalanta case has considered Section 2(d) of the Robinson-Patman Act but it is believed the points there made by the court are analogous to the situation in the case at bar.

It is true that in the Atalanta case, supra, the court found that there was no other competing customer at the time of the promotional sales, but this court does not conclude that the question of whether the sales concerned are "analogous transactions under comparable market conditions at approximately the same time" is to be determined on the sole point of whether at the time of the discount sale complained of there was another competing customer without regard to the other conditions of comparable market conditions and elapsed time between the sales concerned.

Assuming the difference in prices in the case at bar lessened competition, a lessening of competition would also have occurred if Ranchero had purchased all of the cars at Studebaker's December 8, 1960, prices as offered to dealers since that price was some 27 to 30% below the list price paid by plaintiff for the cars purchased by him from January to July, 1960. The court does not understand that the plaintiff contends that Stude-

baker could not, without violating the Act, reduce its price for 1960 model cars, particularly after the new 1961 model was floored for sale, which was normally the fore part of October. Such a position would not be sound for, as stated by the court in the Atalanta case, supra, 258 F.2d at page 372:

"Again the flaw in the Commission's decision is that the terms of an initial sale in a given territory would freeze the supplier into an immutable position. While it is true that the sale on which the allowance was not made occurred after the July 1954 promotional allowance rather than preceding it, it does not follow that without any time limitation whatsoever the supplier was irrevocably committed upon making the first sale to hold open the same promotional allowance to all other prospective purchasers or to refuse to deal with them."

We now turn to the Fourth Proviso, as contained in Section 2(a) of the Act involved (15 U.S.C. § 13(a)). This Proviso is as follows:

" * * * And provided further, That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned."

Having in mind the facts in the case at bar, it appears that there is a question of whether the sales involved are within the exception of the said Fourth Proviso, that is, was the price change in the December 31, 1960, sale by Studebaker to Ranchero "in response to changing conditions affecting the market for or the marketability of the goods concerned" by reason of "obsolescence of seasonal goods."

In discussing "obsolescence", the text writer, in 67 C.J.S., at page 41, states:

"It has been said that it is always difficult to define the word 'obsolescence,' and that it is practically impossible to find a definition that may be applied generally to all cases, for, although the word has been variously defined, most of the definitions that are set out in the numerous decisions are intimately linked to the facts in each case. The word is much used, and its meaning depends on, and varies with, the connections in which it is employed."

At page 42, it is stated:

"Obsolescence is of two types; that representing normal loss in value due to normal progress in the industry, inadequacy, change in demand, in product, or in location, or some similar cause; and that representing unexpected and unforeseen loss in value due to invention, sudden and unforeseen cessation of demand, or any other cause which is a mere contingency."

The Court of Appeals, 3rd Circuit, in Hazeltine Corporation v. Commissioner of Internal Revenue, 89 F.2d 513, states, at page 521 of its opinion:

"As we have pointed out, obsolescence is quite different from depreciation or wear and tear. It is the process of falling into disuse and relates primarily to commercial usefulness and public acceptance, rather than to what one of the witnesses in this case termed technical utility."

The case involved an income tax problem which concerned patents. The above quoted portion of the opinion is used verbatim by the New Jersey court in Fidelity Union Trust Company v. McGraw, 138 N.J.Eq. 415, 48 A.2d 279 at 283.

In the case of United States Cartridge Co. v. United States (1932) 284 U.S. 511, the Supreme Court of the United States, at page 516 of its opinion, 52 S.Ct. 243, at page 245, 76 L.Ed. 431, observes:

"Obsolescence may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory laws and other things which, apart from physical deterioration, operate to cause plant elements or the plant as a whole to suffer diminution in value. * * *"

Referring now to the meaning of the word "seasonal" as used in the Fourth Proviso, plaintiff urges that "seasonal" business has to do with the season of the year and the resulting weather and that "seasonal" industries include only industries made seasonable by natural causes and not by fluctuations in consumer demand.

The meaning of the words "season" and "seasonal" is discussed in 79 C.J.S. pages 929–931. The text writer observes that in one sense the word "season" means a division of the year as determined by the difference in the length of days and nights and by distinctive physical conditions such as rainy season or dry season or summer, spring, fall and winter. Thereafter, and at page 930, it is stated:

"The word 'season' also signifies the period of the year in which something is more in vogue than at others, as when a particular trade, business, or profession is in its greatest state of activity, as the holiday season, the hop picking season. When the word 'season' is employed in this latter sense it is proper to consider evidence in determining the period of time it is intended to cover, for the meaning of the term may depend on various circumstances, but ordinarily a 'season' is not limited to one day for the term usually contemplates a longer time."

With reference to "seasonal", the text writer goes on to say:

"While the word pertains to the four seasons of the year, spring, summer, autumn, and winter, it is popularly used in a somewhat wider sense, and it has been said that it has

a significance and application far different from the terms 'casual' and 'intermittent.'

"With respect to workers or servants it means employed only during a particular season." (pages 930 and 931.)

There are many so-called "seasons" which from practice fall in a certain time of year but are not controlled or made seasonable by natural causes. The football season is traditionally in the fall but could as well have been in the spring. The theatrical season could, from the standpoint of natural causes, be any time of year but has been fixed by tradition and practice, likewise the baseball season and new car season.

Plaintiff urges that the competitive situation in December, 1960, was one of defendant Studebaker's own making and that "if Studebaker made a miscalculation of probable sales it should have discovered it in plenty of time to adjust prices normally and without discrimination against any of its dealers." Citing American Motor Specialties Co. v. Federal Trade Commission, 2 Cir., 278 F.2d 225.

That case involved organization of buyers in a buying group to obtain lower prices than their unorganized competitors. The only reference in the opinion to the point made by plaintiff is in the opening sentence on page 226 of 278 F. 2d, where the court states:

"Absent a cost justification for volume discounts, or a competitive situation not of the seller's own making, or other exceptions to the basic theory of the Section, a seller under Section 2(a) of the amended Clayton Act, 15 U.S.C.A. § 13(a) may not charge discriminating prices based upon the volume of the buyer's purchases."

The court speaks in the disjunctive and it appears to be saying that if you have a competitive situation of the seller's own making you may not charge discriminating prices based on the volume of the buyer's purchases *unless* you have a cost justification for volume discounts *or* are within an exception to the basic theory of the Section, that is a seller under Section 2(a) of the Act.

This case does not appear to assist plaintiff in the action at bar because the court obviously had in mind "other exceptions to the basic theory of the Section", such as the Fourth Proviso.

The evidence in the instant case discloses that every effort is made in February or March of each year to estimate the material needed for the balance of the model run for the year involved so that there will be no cars in inventory when the new model comes out. Obviously there was no intention of manufacturing the cars, which turned out to be excess, for *off-season* sale and it appears to the court that their manufacture was in good faith, although failure to properly evaluate the effect of new compact models of other companies, and the over emphasis of the sales of the prior year (1959), resulted in a poor estimate of the number of cars that could be sold during the balance of the 1960 model season. It appears from the terms of the Fourth Proviso, Congress had in mind that the passing of a season causes obsolescence in goods produced for sale during that season and that the provision would be unnecessary unless the legislators had in mind that it is not uncommon for obsolescence of products to result by reason of being manufactured for sale during a particular period or season.

The court concludes that a normal change in car models, made in good faith, as in the instant case, would come within the exception of the Fourth Proviso, and that it, therefore, follows that the sale by Studebaker to Ranchero on December 31, 1960, *in the circumstances here involved,* did not constitute a violation of the Clayton Act as supplemented by the Robinson-Patman Act, which amends same.

Counsel for defendant is requested to prepare Findings of Fact, Conclusions of Law and Judgment in accordance with the foregoing opinion and as required by Rule 7, Local Rules.