**UNITED STATES of America,**
**Plaintiff,**

v.

**UNITED LIQUORS CORPORATION,**
**Sidney Perlberg, King Klein, Hubert R.**
**Lewis, Alex F. Barzizza, George B. Hart,**
**Defendants.**

**Civ. No. 2672.**

United States District Court
W. D. Tennessee, W. D.

Aug. 1, 1956.

Herbert Brownell, Jr., Stanley Barnes, Washington, D. C., Worth Rowley, Boston, Mass., Raymond K. Carson, Walter W. Dosh, Washington, D. C., John H. Earle, Noel E. Storey, Millsaps Fitzhugh, Memphis, Tenn., for plaintiff.

Shea & Pierotti, Taylor, Costen & Taylor, Gerber, Rond & Gerber, Memphis, Tenn., Noone & Noone, Chattanooga, Tenn., Arnold, Fortas & Porter, Washington, D. C., for defendants.

BOYD, District Judge.

The Court upon the pleadings and evidence adduced on the trial of this cause makes the following:

#### Findings of Fact

**I.**

Under the laws of the State of Tennessee manufacturers may not sell alcoholic beverages direct to Tennessee retailers, but may sell alcoholic beverages only to Tennessee licensed wholesalers, and Tennessee licensed retailers may buy alcoholic beverages only from Tennessee licensed wholesalers. As used herein, the term "alcoholic beverages" means whiskey, rum, gin, brandy, cordial, wine, cider, alcohol and any other spiritous, vinous, malt, or fermented liquor, liquid or compound by whatever name called,

containing one-half of one percent or more of alcohol by volume, which is fit for beverage purposes, except beer.

## II.

The defendants are licensed wholesalers of alcoholic beverages having their principal places of business in Memphis, Shelby County, Tennessee, from which they sell alcoholic beverages to licensed retailers located in the Counties of Shelby, Dyer and Lake, which presently comprise the Memphis trading area.

The defendant United Liquors Corporation was incorporated under the laws of the State of Tennessee on July 1, 1948, and the defendant Sidney Perlberg has been its president since that date. Since sometime prior to 1949 the defendant George B. Hart has been a partner in Valley Wholesale Liquor Company and the defendant Hubert R. Lewis has been a partner in Bluff City Beverage Company. Since 1939 the defendant King Klein has been sole owner of Shelby Liquors and the defendant Alex F. Barzizza has been sole owner of Southwestern Wine Company. These individual defendant wholesalers have been continuously and actively engaged in the operation, management and control of their respective firms during the periods of time indicated above.

## III.

At least 95% of all alcoholic beverages purchased and sold by licensed wholesalers and retailers within the State of Tennessee is produced outside the State of Tennessee and shipped therefrom into the State of Tennessee for sale and distribution through wholesalers and retailers to the consuming public. All alcoholic beverages purchased and sold by defendant wholesalers and other Memphis wholesalers are purchased from manufacturers located outside the State of Tennessee, with the exception of one manufacturer located in Tennessee whose products are distributed at wholesale in the Memphis trading area by Valley Wholesale Liquor Company which also distributes numerous other brands and types of alcoholic beverages purchased from manufacturers located outside the State of Tennessee. None of the various brands of alcoholic beverages are distributed by more than one of the wholesale firms in Memphis. Alcoholic beverages purchased by the defendant wholesalers are delivered to their respective warehouses in Memphis from which orders are filled and deliveries are made to retailers located in the Memphis trading area. Each of the defendant wholesalers maintains sales and delivery forces engaged in day-to-day solicitation of orders from and deliveries to retailers.

## IV.

Prior to July 1949, it had been a practice in the Memphis trading area for wholesalers to offer and give quantity discounts, sometimes referred to as "deals", in sales of alcoholic beverages to retailers. From sometime prior to July, 1949, to October 21, 1949, no State law or regulation prohibited wholesalers from offering or giving such quantity discounts. During the period October 21, 1949, to December 11, 1950, a regulation, usually referred to as "Regulation 10", issued by the Commissioner of Finance and Taxation for the State of Tennessee, prohibited wholesalers from offering or giving quantity discounts to retailers. At no time since December 11, 1950, has any State law or regulation prohibited wholesalers from offering or giving such quantity discounts to retailers.

## V.

The Memphis Wholesale Liquor Dealers Association (hereinafter sometimes referred to as the "wholesale association") was organized in 1939 as an unincorporated trade association of wholesale liquor dealers serving the Memphis trading area. Since 1949 the defendant wholesalers and their respective firms have been members of the Memphis Wholesale Liquor Dealers Association, and from time to time during this period have attended and participated in many of the Association's meetings at which frequent discussions and understandings have been had among the wholesalers, and on many occasions with repre-

sentatives of the Memphis Retail Package Stores Association, concerning the elimination of wholesale quantity discounts and other methods of stabilizing prices at the wholesale and retail levels. During all or most of the period mentioned the wholesale association employed a paid Executive Secretary whose duties included the calling of association meetings to deal with complaints or requests of the Memphis Retail Package Stores Association concerning current pricing problems in the Memphis trading area.

### VI.

The Memphis Retail Package Stores Association, Inc. (hereinafter sometimes referred to as the "retail association"), was organized in July, 1949, as a trade association of licensed retail liquor dealers in the Memphis trading area. At that time there were over 175 licensed retailers doing business in Memphis and all but a very few of them became members of the association. Some of the licensed retailers who did not join the retail association were known in the trade as price cutters. The principal purpose of the retail association, throughout its existence, has been to fix and maintain wholesale and retail prices of alcoholic beverages sold in the Memphis trading area.

### VII.

Soon after the organization of the Memphis Retail Package Stores Association in July, 1949, its officers and some of its members on two occasions met with members of the Memphis Wholesale Liquor Dealers Association, including the defendant wholesalers, to discuss the retail association's proposals for stabilizing prices. As a result, each of the defendant wholesalers and others agreed that their respective companies would eliminate quantity discounts, would issue new price lists by a given date, and in computing such prices would adhere to the formula previously used by the Office of Price Administration during periods of Government price controls.

It was the expressed view of the retailers present that if the Government had been entitled to use the formula in establishing maximum prices, the industry should be able to use it in establishing minimum prices. The defendant wholesalers also agreed that prices so computed would be rounded off to the nearest nickel. Following these meetings, many members of the retail association either stopped or slowed down their purchases from Consolidated Distributors, a non-defendant wholesaler which had announced it would continue to offer quantity discounts. Within a short time thereafter, but before "Regulation 10" was promulgated in October 1949, however, all Memphis wholesalers, including Consolidated Distributors, had discontinued offering or giving quantity discounts to retailers.

### VIII.

During the early months of 1950, after many manufacturers had, at the request of the Memphis Retail Package Stores Association, entered into resale price maintenance agreements, or so-called "fair trade" agreements, for their brands of alcoholic beverages in the Memphis trading area, members of that association took concerted action to inhibit and limit the sales and distribution of one or more brands distributed by Consolidated Distributors because such brands had not been "fair-traded". The concerted action took the form of decreased purchases, cancelled orders, return of deliveries, removal of brands from retailer shelves, and removal of advertising displays.

### IX.

During 1950, Consolidated Distributors, Bluff City Beverage Company and the defendant United Liquors Corporation were boycotted by retail association members for making sales to price cutting retailers. Meetings of the Memphis Wholesale Liquor Dealers Association were held to discuss the boycotts and to agree upon a course of action in working out the problem with the retail association.

### X.

In December 1950, the Memphis Retail Package Stores Association advised manufacturers whose products were already "fair-traded" in the Memphis trading

area that the retail association, as a unit, would discriminate against the products of manufacturers who failed to enforce their "fair trade" contracts.

### XI.

During the years 1950 and 1951, the Memphis Retail Package Stores Association maintained a Pricing Committee whose Chairman, on several occasions, appeared before the Memphis Wholesale Liquor Dealers Association to suggest and arrange for changes in the suggested retail price lists, issued by the wholesalers, in specific instances where wholesalers had not provided the full mark-up desired by the retail association.

### XII.

In March 1951, or shortly thereafter, a smaller Memphis wholesaler was forced to go out of business as the direct result of a boycott imposed on "Old Quaker" whiskey which he was attempting to introduce in the Memphis market at wholesale prices and suggested retail prices which had not been approved by either the retail association or the wholesale association. The boycott immediately followed direct threats of such a boycott made at a joint meeting of the two associations and a subsequent effort by the Executive Secretary and a member of the wholesale association to persuade the wholesaler to adhere to the percentage mark-ups previously agreed upon.

### XIII.

During 1951, other wholesalers were called upon at meetings of the Memphis Wholesale Liquor Dealers Association to make adjustments in their wholesale prices to retailers to conform to agreed upon mark-ups. In one instance, Consolidated Distributors was visited by a selected representative of the wholesale association to examine Consolidated's costs on particular brands to determine whether resale prices had been computed in accordance with the agreed formula.

### XIV.

Despite the fact that "Regulation 10", which prohibited wholesale quantity discounts, was rescinded in December 1950, all members of the Memphis Wholesale Liquor Dealers Association refrained from offering or giving quantity discounts to Shelby County retailers until about November or December 1951. During the summer of 1951, members of the wholesale association had met with representatives of the Memphis Retail Package Stores Association and advised them that since alcoholic beverage wholesalers from Nashville, Tennessee, were offering quantity discounts to the Memphis wholesalers' customers located in counties other than Shelby, the Memphis wholesalers were losing business in those counties to Nashville wholesalers. The purpose of the meeting was to explain the wholesalers' need for offering discounts to retailers in those outlying counties, to obtain the approval of the retail association, and to assure its members that the discounting practices would not spread to Shelby County.

### XV.

The principal and continuing objective of the Memphis Retail Package Stores Association throughout its existence has been to achieve a completely rigid price structure on all alcoholic beverages sold in the Memphis trading area, both at wholesale and retail, in order that all retailers might work on identical gross profit margins without price competition. This was sought to be accomplished at the wholesale level through the elimination of wholesale quantity discounts. At the retail level, the problem was more difficult because of the large number of retailers involved and the persistent price cutting habits of some few retailers. For this apparent reason, the retail association, its officers and members have continuously sought to induce, compel, and coerce all manufacturers of alcoholic beverages to establish and enforce minimum resale prices in the Memphis trading area through the use of so-called "fair trade" agreements. The intensity of the associations' efforts to achieve this end, and the means employed by it, varied from time to time according to prevailing competitive conditions and changes which occurred in the status of

the so-called non-signer provisions of the Tennessee Fair Trade Law, T.C.A. § 69–201 et seq.

## XVI.

Efforts of the Memphis Retail Package Stores Association to achieve a completely stabilized market in Memphis were impeded in 1951 by a Supreme Court decision, Schwegmann v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, 19 A.L.R.2d 1119, decided May 21, 1951, which held that under existing legislation resale price maintenance agreements were not enforceable against non-signers. In 1952, however, following enactment of the McGuire Act, 15 U.S.C.A. § 45, which added non-signer enforcement to the Miller-Tydings exemption, 15 U.S.C.A. § 1, a petition signed by 174 of Shelby County's 182 retailers was sent by the retail association to 20 or more major manufacturers who were urged to establish resale price maintenance agreements for their products as a means of stabilizing the retail liquor industry in Shelby County. During the period which followed, officers and members of the retail association continued their efforts to bring pressure on manufacturers by urging all retailers to give preferential sales and display treatment to all "fair traded" brands and by repeated efforts to induce all Memphis wholesalers and manufacturers' representatives to persuade their respective manufacturers to "fair trade". By December 1953, only two or three manufacturers had responded by executing minimum resale price maintenance contracts for their brands in the Memphis trading area. In December 1953, the Memphis Retail Package Stores Association intensified its campaign for the adoption and enforcement of minimum resale prices on all alcoholic beverages and sent letters to manufacturers urging them to "fair trade" in the Memphis market.

## XVII.

In January 1954, the retail association appointed a so-called "Fair Trade Committee" which formally called upon each of the defendant wholesalers and other Memphis wholesalers and requested their active support and assistance in influencing their respective suppliers to enter into "fair trade" agreements in the Memphis trading area. Each of the defendant wholesalers was at that time, and for several years had been, fully aware of the purposes, objectives and activities of the Memphis Retail Package Stores Association in its efforts to eliminate price cutting and to otherwise establish uniform prices, mark-ups and profit margins on all alcoholic beverages sold in the Memphis trading area. Each of the defendant wholesalers at that time knew that it was not the purpose or intent of the retail association to promote the purpose of the Miller-Tydings Act, or the McGuire Act, or the Fair Trade Law of Tennessee, or to establish prices for the protection of the good will in the trademarks, brands or names of the manufacturers of alcoholic beverages. To the contrary, each of the defendant wholesalers was at that time fully aware of the purpose to use "fair trade" agreements as devices for establishing and enforcing adherence to a system of uniform retail prices pursuant to an agreement and understanding among members of the retail association. In response to the request of the Fair Trade Committee, each of the defendant wholesalers agreed to urge his suppliers to fair trade.

## XVIII.

At a meeting of the Memphis Retail Package Stores Association on or about February 20, 1954, members were openly urged to discriminate against non-fair-traded brands and were provided with copies of a document, known in the trade as the "Ten Commandments", instructing them to remove from retail stores all advertising of non-fair-traded brands, to give such brands the worst possible shelf positions, to make every effort to switch every customer away from non-fair-traded brands, to decrease actual sales of non-fair-traded brands, and to insist on elimination of wholesale quantity discounts to price cutters. The "Ten Commandments" received wide circulation and publicity among retailers,

wholesalers and manufacturers of alcoholic beverages.

### XIX.

Within a short time after the issuance of the "Ten Commandments", many members of the retail association were adhering to its terms in an all-out effort to force manufacturers to "fair trade" their products in the Memphis market. As a result, the sales volume of many of the leading non-fair-traded brands began to decline through lack of adequate displays, advertising and sales promotion in retail stores. The discrimination against non-fair-traded brands was greatly intensified and the number of retailers participating in the scheme advanced on an increasing scale during the months of March to September 1954. During this period, the retail association organized and instructed squads of its members to make periodic visits to groups of retail stores to observe their displays and treatment of "fair-traded" brands, as against non-fair-traded brands, and to urge continued adherence to the scheme. Lists of "fair-traded" brands and their prices were prepared and distributed by the retail association for the guidance of its members. Sales of many leading non-fair-traded brands declined very substantially. Members of the retail association received frequent oral and written admonitions from association officers and other members to sell and display nothing but "fair-traded" brands.

### XX.

The facts recited in Paragraph 19 hereof were concurrently the subject of widespread discussion in the trade and all Memphis wholesalers and their respective suppliers became acutely aware of the nature and purpose of the retail association's boycotting activities and the resulting effect on sales. Many of the manufacturers were urged by their Memphis wholesalers, including defendant wholesalers, to "fair-trade" their products and, in some instances, were furnished by the wholesalers with the suggested retail prices to be established, and they were established, as the manufacturers' so-called "fair trade" prices. On some occasions, officers and other representatives of the retail association met with manufacturers or their representatives to discuss and agree upon details of proposed "fair trade" agreements, including specific prices to be established and the actual signing of the minimum resale price maintenance contracts at association meetings.

### XXI.

Prior to March 1954, only two or three manufacturers had "fair-traded" their products in the Memphis trading area at any time after the McGuire Act became effective in 1952. During the period of March 1954, through August 1954, however, virtually all manufacturers whose brands were distributed by the defendant wholesalers and other Memphis wholesalers, other than Consolidated Distributors, "fair-traded" their brands in the Memphis trading area. None of the products distributed by Consolidated Distributors were "fair-traded" at that time or at any subsequent time.

### XXII.

As a result of the retail association boycott of non-fair-traded brands in 1954, Consolidated Distributors experienced a very substantial decline in sales to retailers participating in the boycott activities, particularly during the period June through August 1954, when the brands of Consolidated Distributors were prominent among the very few remaining non-fair-traded brands in the Memphis market.

### XXIII.

During or shortly before the month of June 1954, the Executive Secretary of the Memphis Wholesale Liquor Dealers Association resigned his position following the Association's action in reducing his salary and expressing dissatisfaction with his services for the stated reason that he was unable to bring one member, Consolidated Distributors, "into line" with the seven other members. At about the same time, Consolidated Distributors resigned from the wholesale association. All of the defendant wholesalers were

members of the wholesale association at that time.

## XXIV.

Some of the manufacturers of alcoholic beverages who during 1954 entered into "fair trade" agreements, by which minimum resale prices were established on their respective brands being sold in the Memphis trading area, expressly limited the application of the agreements to the Memphis area, and did not enter into "fair trade" agreements to cover their identical products being sold through licensed retailers located in other areas of the State of Tennessee. Still other manufacturers in 1954 "fair traded" their brands in the Memphis trading area at prices which varied widely from the "fair trade" prices for identical brands which they were establishing in other areas of Tennessee at or about the same time.

## XXV.

Soon after establishing "fair trade" prices on their respective brands in the Memphis trading area in 1954, most of the manufacturers were pressed by officers and members of the Memphis Retail Package Stores Association, through their respective local representatives and wholesalers in Memphis, including defendant wholesalers, to enforce adherence to the minimum resale prices so established. As a result several of the manufacturers sought and obtained injunctions against various Memphis retailers who were alleged to have made sales below minimum "fair trade" prices. Some of the same manufacturers later sought dissolution of the injunction after the United States Department of Justice in October 1954, began its investigation which preceded the filing of the complaint in this case.

## XXVI.

All of the defendants have been and are now engaged in a combination and conspiracy to fix, maintain, and stabilize prices of alcoholic beverages sold and shipped in interstate commerce.

## Conclusions of Law

### I.

The Court has jurisdiction of the subject matter hereof and of each of the defendants.

### II.

The defendants have been and are now engaged in an unlawful combination and conspiracy to restrain interstate trade and commerce in the sale and distribution of alcoholic beverages in violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1. United States v. McKesson & Robbins, 1956, 351 U.S. 305, 309, 76 S.Ct. 937, 100 L.Ed. 1209; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Frankfort Distilleries, 1945, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Lloyd v. United Liquors Corp., 6 Cir., 1953, 203 F.2d 789