**CHECKER MOTORS CORPORATION,**
Plaintiff,

v.

**CHRYSLER CORPORATION** and Chrysler Motors Corporation, Defendants,

Checker Taxi Company, Inc., et al., Additional Defendants on Counterclaim.

No. 64 Civ. 866.

United States District Court
S. D. New York.
March 29, 1968.

See also, D.C., 39 F.R.D. 37.

Shea, Gallop, Climenko & Gould, New York City, for plaintiff.

Kelley, Drye, Newhall, Maginnes & Warren, New York City, for defendants.

MANSFIELD, District Judge.

In this private antitrust suit for treble damages and injunctive relief pursuant to §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), plaintiff, Checker Motors Corporation (Checker), moves for partial summary judgment against defendants Chrysler Corporation and Chrysler Motors Corporation (collectively referred to as "Chrysler" [1]), or, in the alternative, for preliminary injunctive relief. For the reasons set out in the decision, the motion is denied in all respects.

Since 1922 Checker, a New Jersey corporation with its principal place of business in Kalamazoo, Michigan, has been engaged, among other activities, in the production and sale of "purpose-built" taxicabs, i. e., automobiles designed and engineered for use as taxicabs. In pro-

[1]. Chrysler Corporation manufactures automobiles that are sold by it to Chrysler Motors, which in turn sells the cars to authorized dealers throughout the country.

ducing such vehicles it has incorporated into chassis and bodies of its own manufacture engines, axles, transmissions and other parts purchased from independent suppliers.[2] Checker sells its taxicabs through sales offices in various cities of the United States, principally New York, Boston, Chicago and Detroit. Prior to 1963 New York City provided one of its major markets.[3]

Incorporated in Delaware, Chrysler is engaged in the business of manufacturing and selling automobiles, automobile accessories and parts. As one of the three major automobile colossi, Chrysler, in 1966, reported $5.6 billion in gross sales and had net earnings in the amount of $189.2 million. Chrysler's vehicles are sold in various markets, including the passenger car and taxicab markets.

Chrysler-made taxis and passenger cars are essentially the same, with a series of differences designed to satisfy, in the case of the taxicabs, the operator's need for continuous heavy duty, short-trip, stop-and-go, low fuel usage, and, in the case of the passenger car, the purchaser's desire for more comfortable riding, aesthetic appearance, quick getaway, and convenience. For example, the Chrysler 1965 Dodge Coronet model taxicab has a replaceable oil filter element, stiffer shock absorbers, springs and suspension system, special brake lining, wider wheel rims, heavier capacity battery, special lights, and special carburetor, which are features not found on the passenger car. In addition, the paint and seat-cover material of the passenger car are more stylish than those of the taxi counterpart, and the passenger car usually contains more chrome. The fundamental elements of both cars, however, including the frame and engine, are essentially the same.

Chrysler distributes its vehicles to the public via a nationwide system of independent franchised dealers. In promoting the sale of its taxis and passenger cars to the consuming public, Chrysler, like other large automobile manufacturers, engages in extensive advertising campaigns. Although Chrysler suggests a retail price for its vehicles each dealer, upon purchasing automobiles from it, assumes the risk of loss, and independently determines the retail price of automobiles purchased by it from Chrysler for resale.

In 1962, in order to promote the sale of its taxicabs, Chrysler instituted the "Commercial Fleet Value Program" ("Rebate Plan" herein), under which, throughout the United States, purchasers of two or more taxicabs from Chrysler-authorized qualified dealers could, upon completing a form and returning it to Chrysler, receive a rebate of up to $200 per taxicab from the manufacturer. In 1966 and 1967, the plan was altered to include purchasers of a single taxicab and the rebate was set at $183 per vehicle. Chrysler dealers have advertised the program, although the accounting and payments have been handled by Chrysler.

The present treble damage action was commenced in 1964. Checker's complaint alleges a combination and conspiracy between Chrysler, its subsidiaries, dealers and others, beginning in 1960, to restrain trade in the manufacture and sale of taxicabs by eliminating Checker as a competitor, excluding it from the New York City and other markets, and otherwise injure its business, and to monopolize such trade and commerce. More specifically it is alleged that Chrysler, after

2. Defendants' contention that Checker is an "assembler," rather than a primary "manufacturer," of automobiles, does not appear to have any legal significance in the disposition of the present motion, it being undisputed that the parties compete for ultimate sale of their respective products to taxicab operators. Furthermore, it appears that all automobile manufacturers purchase some components from independent suppliers.

3. Markin Aff., April 12, 1967; Def's Ex. B to Ehrenbard Aff., Oct. 24, 1967, pp. 14–15, indicating location of sales office and taxi subsidiary in New York; United States v. Yellow Cab Co., 80 F. Supp. 936, 940 (N.D.Ill.1948), affd., 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949); Def's Ex. J; Plf's Reply Memo, p. 8.

being advised that Checker proposed to increase its production and sales from 7,000 to 24,000 vehicles per annum, undertook to supply Checker's requirements of components for use in Checker taxicabs, private passenger automobiles and other vehicles, and to sell Checker duplicate tools, discs and fixtures at an agreed-upon low price arrangement, inducing Checker, in reliance upon such commitments, to commence re-engineering its automobile chassis and bodies for adaptation to products manufactured by Chrysler, and to construct a large number of prototype vehicles which were subjected to extensive experimental testing; that in the meantime, Chrysler in bad faith delayed preparation of a formal agreement, postponed performance of its undertakings, and proceeded to solicit Checker's taxicab clientele and to disseminate reports that Checker proposed to utilize Chrysler's motor in the manufacture of Checker taxis, thereby giving Chrysler an unfair competitive advantage and causing a substantial loss of momentum in Checker's sales and a prolonged disruption of its production.

The complaint further alleges that Chrysler sold private automobiles equipped as "taxicabs" at "unlawful, low and discriminatory prices" financed out of profits from private passenger sales, and increased its taxicab sales through the Rebate Plan

"pursuant to which [Chrysler] and [its] co-conspirators unlawfully discriminated in prices between purchasers of defendants' passenger automobiles equipped with the so-called 'taxicab package' and purchasers of said automobiles not so equipped." (Complaint Par. 14(f) (i))

It was alleged that even in the absence of the Rebate Plan

"the suggested retail list prices of defendants' passenger automobiles sold for use as taxicabs were and are generally lower than the suggested retail list prices of automobiles of the identical make and model sold to the general public for use as private passenger cars, notwithstanding the fact that the automobiles sold as taxicabs include more costly extra items known as the 'taxicab package'." (Complaint Par. 14(f) (ii))

The rebate accorded to purchasers of Chrysler's automobiles sold for use as taxicabs, it is alleged, was not supported by any cost justification, the program allegedly being motivated by

"defendants' recognition that the greatest volume of taxicab sales usually takes places in New York City, and that domination by defendants of the New York City taxicab market, in addition to eliminating plaintiff as a substantial competitor, would be a valuable lever and selling point by which defendants could increase their share of the passenger automobile market throughout the United States. The importance attached by defendants to dominating the New York City taxicab market as a means of furthering the sales of various of its passenger automobiles is shown by the extensive national advertising campaign defendants have constructed around its New York City taxicab sales. Said advertising campaign falsely and fraudulently represents to the public at large that many of defendants' passenger cars sold for use as taxicabs are 'taxi-labs', whose performance can be meaningfully compared to defendants' private passenger car performance. Such advertising misleadingly omits any mention of the special, heavy duty 'taxicab package' installed in the passenger cars equipped for use as taxicabs, which completely invalidates the comparison defendants propose to make between their passenger cars equipped for use as taxicabs and those not so equipped." (Complaint Par. 14 (f) (vii))

Chrysler's conduct is claimed to have substantially lessened competition in the line of commerce consisting of the manufacture and sale in interstate commerce of automobiles, including taxicabs. As a result of Chrysler's activities, Checker seeks $45 million in damages and an injunction permanently enjoining Chrysler,

its servants, agents, employees and others in privity with them, from conspiring to destroy plaintiff's business by unlawul means.

On the present motion, only the legality of the Rebate Plan is in issue. Checker asserts that the arrangement as employed in New York City amounts to (1) a *per se* unlawful price fixing contract, combination, or conspiracy between Chrysler and its dealers in violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1; and (2) a discriminatory pricing arrangement in violation of § 2(a) of the Robinson-Patman Act, 15 U.S.C.A. § 13 (a). As an alternative to partial summary judgment, Checker seeks a preliminary injunction against Chrysler's continuing the Rebate Plan during the pendency of this litigation.

Chrysler first contends that the motion should be denied because it is predicated on claims different from those alleged in the complaint. Although the complaint's emphasis is almost entirely on Chrysler's alleged discrimination in pricing, Paragraph 14(e) does allege that its taxicab sales have been made at *"unlawful,* low and discriminatory prices," which is probably sufficient to support a Sherman Act attack upon the Rebate Plan in this age of "notice" pleading. However, in view of this Court's denial of plaintiff's motion for substantive reasons, it becomes unnecessary to rest the decision on such a technical ground. With respect to the Robinson-Patman claim, there is no merit in defendants' contention. The complaint sets forth a § 2(a) price discrimination primary line injury claim with sufficient particularity to put Chrysler on notice that Checker is allegedly aggrieved by reason of the rebate given to taxi purchasers. See Complaint Par. 14(f) (i), (vii).

Equally meritless is Chrysler's contention that since the complaint was filed in 1964 it cannot be used to attack Chrysler's Rebate Plan in effect in subsequent years. Checker's complaint alleges a continuing course of illegal conduct on Chrysler's part, against which injunctive relief is sought. Complaint Pars. 16, 17.

Defendants next assert that Rule 56, F.R.Civ.P., does not authorize a motion for partial summary judgment of the kind before the Court, because plaintiff is not entitled to split up the various wrongs asserted in a single count, and move with respect to one and not with respect to the others, i. e., the alleged unlawful activity in causing plaintiff to alter its production methods. However, Rule 56(a) authorizes a claimant to move for summary judgment in his favor upon all *"or any part"* thereof. In White Motor Co. v. United States, 372 U.S. 253, 264, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), the Supreme Court allowed such fragmentation by granting summary judgment with respect to the price fixing claim, and denying the motion with respect to the legality of territorial and customer limitations contained in White's franchise contracts. At least in a complex case involving a series of separate transactions, as distinguished from one involving part of a single transaction or a portion of damages claimed, plaintiff's motion for partial summary judgment ought not be dismissed on the hyper-technical basis urged by Chrysler, since plaintiff's motion is not only designed to reach a quick judgment that is in the interest of the parties, but also undertakes to prevent the needless waste of judicial resources where it appears that the particular claim under judicial scrutiny involves no genuine issue of material fact. And this is the very intent of Rule 56.

*The § 1, Sherman Act, Claim*

Having disposed of the preliminary sparring, the legality of the Rebate Plan under § 1 of the Sherman Act, 15 U.S. C.A. § 1,[4] comes into focus. Plaintiff asserts that the plan is a *per se* price fixing agreement between Chrysler and its

---

4. "Every contract, combination in the form of trust or otherwise, or conspiracy, in rstraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *."

dealers and therefore conclusively unreasonable, irrespective of purpose, reasonableness or competitive effect. United States v. Sealy, Inc., 388 U.S. 350, 355, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); United States v. General Motors, 384 U.S. 127, 147, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 220–223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927).

Regardless of the absence of agreement as to a specific or uniform price, a wide variety of horizontal and vertical arrangements have been classified as price-fixing agreements and therefore condemned as unlawful *per se,* e. g., Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (agreement on maximum resale prices); United States v. United Liquors Corp., 149 F.Supp. 609 (W.D.Tenn.1956), affd. per curiam, 352 U.S. 991, 77 S.Ct. 557, 1 L.Ed.2d 540 (1957) (agreement on elimination of quantity discounts); Plymouth Dealers Assn. of Northern Cal. v. United States, 279 F.2d 128 (9th Cir. 1960) (agreements on starting price for bargaining and trade-in allowances); United States v. Gasoline Retailers Assn., 285 F.2d 688 (7th Cir. 1961) (agreement not to give trading stamps); United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956) (manufacturer's requirement that wholesaler maintain resale price levels determined by manufacturer). However, an essential element is the competitor's surrender, express or implied, of some measure of pricing discretion. The evil of price-fixing agreements is that they

> "cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." (Kiefer-Stewart Co. v. Joseph Seagram & Sons, Inc., 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951))

■ Conduct or agreements not restricting a competitor's pricing independence, on the other hand, falls short of illegal price fixing. See Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655, 687 (1962). For instance, in Susser v. Carvel Corp., 332 F.2d 505 (2d Cir.), cert. granted, 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964), cert. dismissed as improvidently granted, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965), an ice cream manufacturer and its franchised dealers were held not to have engaged in an unlawful price fixing scheme where the manufacturer had merely recommended a retail price to the dealers, in the absence of the manufacturer's endeavoring to enforce the price structure at the retail level. In affirming the legality of the arrangement, Chief Judge Lumbard emphasized that "the franchise provisions explicitly reserved to the individual dealer the right to set whatever price he desired." 332 F.2d at 510.

On its face Chrysler's Rebate Plan does not curtail the dealer's pricing discretion. Each dealer is free (1) to raise retail taxicab prices, thus nullifying the effect of the rebate; (2) to keep his prices constant, and thus render Chrysler taxicab price competitive vis a vis General Motors, Ford, Checker and other automobile makers who grant similar rebates; or (3) to lower his prices still further in competition against both Chrysler and non-Chrysler dealers alike. No evidence has been offered to the effect that the $183 rebate has even the slightest tendency to restrict in any way the dealer's independent decision and determination as to the retail sales price quoted by him to customers for Chrysler taxicabs. The most that appears from the record before us is that the plan manifests to the taxicab purchaser a desire on Chrysler's part to promote competitive sale of its taxis, at least to the extent of giving the appearance of a price advantage to the customer in the form of a $183 rebate. Possibly the practice acts as a psychological inducement to the customer that cannot be realized through a direct price reduction to the dealer in the identical amount

which would, as a practical matter, enable the dealer in his discretion to reduce his price accordingly. Certainly the marketplace is full of similar manufacturer-originated promotional sales "gimmicks," such as "free goods" in the grocery and drug trades, coupons entitling the holder to cash or discounts, and the like, which do not run afoul of the Sherman Act in the absence of a showing of impropriety. The plan does not give as much practical pricing flexibility to the Chrysler dealer as would a direct $183 price reduction in the wholesale price, since the customer, rather than the dealer, is automatically entitled to the rebate upon purchase of a Chrysler taxicab, whereas if Chrysler reduced the price to its dealers by $183, bargaining between each dealer and his customer might ensue to determine how much of the reduction, if any, would be passed along to the retail customer. However, this is an illusory distinction, since the dealer has the freedom to increase his retail price to offset the $183 rebate.

■ Thus there is a failure to show any provision of the plan, or any facts, indicating that the plan would tend to affect the exercise of competitive pricing discretion, or to affect or tamper with the range, level, scale, or amount of the price paid for Chrysler taxicabs, such as appears in price-fixing or distribution agreements that have been struck down as unreasonable without more. United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1941); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). In the absence of proof that the Rebate Plan has a tendency to restrict the dealer's pricing independence, or has some pricing effect, it amounts to nothing more than a promotional device which cannot be labelled illegal *per se.*

Having determined that it is inappropriate to condemn the plan as a *per se* unlawful price fixing arrangement on this motion for summary judgment, the question remains whether the Rebate Plan poses such a pernicious effect on competition that it must be condemned as violating the rule of reason. White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Compare, Areeda, Antitrust Analysis ¶¶ 347, 348 (1967). The legality of a vertical rebate plan under § 1 of the Sherman Act, like that of the territorial and customer restrictions in the franchise agreement before the Supreme Court in *White Motor Co.,* supra, can be determined only after an inquiry into facts peculiar to the taxicab business for the purpose of determining what effect, if any, the program has had, or is likely to have, upon competition and dealer price conduct, and whether under all the circumstances it must be condemned as unreasonable. As the Supreme Court stated in Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

Here the moving papers fail to offer any proof to the effect that the Rebate Plan has had, or is likely to have, an adverse effect on competition in the sale of taxicabs.

## NEW YORK CITY
## TAXICAB REGISTRATIONS

| Date | Checker | Ford | (Chrysler) Dodge | Chevrolet | Studebaker | (Chrysler) Plymouth | Misc. | Total |
|---|---|---|---|---|---|---|---|---|
| Dec. 1961 | 3,603 | 4,176 | 1,813 | 729 | 791 | 495 | 116 | 11,723 |
| June 1962 | 3,872 | 3,400 | 2,026 | 914 | 1,080 | 343 | 95 | 11,730 |
| Dec. 1962 | 4,056 | 2,938 | 2,376 | 953 | 1,092 | 315 | 71 | 11,737 |
| June 1963 | 3,795 | 2,831 | 2,921 | 965 | 981 | 203 | 51 | 11,747 |
| Dec. 1963 | 3,405 | 3,093 | 3,634 | 865 | 546 | 161 | 45 | 11,749 |
| June 1964 | 2,301 | 3,186 | 4,834 | 864 | 424 | 106 | 37 | 11,752 |
| Dec. 1964 | 1,776 | 3,192 | 5,587 | 840 | 246 | 78 | 34 | 11,753 |
| April 1965 | 1,607 | 3,089 | 5,957 | 821 | 178 | 69 | 32 | 11,753 |
| Dec. 1965 | 1,046 | 3,046 | 6,867 | 691 | 30 | 48 | 25 | 11,753 |
| Aug. 1966 | 885 | 2,937 | 7,261 | 587 | 20 | 53 | 28 | 11,771 |

Registration figures may be a misleading indicator of sales, however, for the reason that they include both new and used taxicabs in service at any given time. A more accurate source would probably be the actual sales of taxicabs during the relevant period. Sales figures made available to the Court for New York City for the period 1964–1967 are as follows:

### New York City Taxicab Sales

| | 1964 Model | | 1965 Model | | 1966 Model | | 1967 Model | |
|---|---|---|---|---|---|---|---|---|
| | Unit | Share | Unit | Share | Unit | Share | Unit | Share |
| Checker | 415 | 6.6% | 200 | 3.1% | 268 | 4.7% | 269 | 4.7% |
| Chrysler | 3,467 | 55.2% | 4,221 | 66.4% | 3,357 | 60.1% | 2,648 | 46.6% |
| Ford | 1,831 | 29.2% | 1,459 | 23.0% | 1,958 | 34.8% | 1,646 | 28.9% |
| Gen. Mts. | 375 | 6.0% | 478 | 7.5% | 20 | 0.4% | 1,124 | 19.8% |

The above figures, however, fail to reflect a sharp drop in 1964 sales of Checker cabs into New York City as compared with earlier years, allegedly as a result of Chrysler's introduction of its Rebate Plan in 1962. Notwithstanding Checker's sharply declining share of the New York registrations, however, according to its own figures its nationwide sales have not declined quite as noticeably during the relevant period:

### CHECKER MOTORS CORPORATION

#### Annual Taxicab Sales

| | United States | New York City |
|---|---|---|
| 1960 | 5,943 | 1,385 |
| 1961 | 4,219 | 1,667 |
| 1962 | 5,603 | 1,666 |
| 1963 | 4,969 | 1,221 |
| 1964 | 3,967 | 247 |
| 1965 | 4,050 | 240 |

Although Checker claims that the Rebate Plan has been a cause in the decline in Checker's sales, Chrysler sets out other reasons for its difficulty. First, in New York City a taxicab owner is required to have a medallion to operate a taxi vehicle. Prior to 1953 National Transportation Co. (National), a Checker subsidiary, controlled in excess of 1,600 of the total of approximately 11,000 taxicab medallions, or franchises, authorized by the City of New York. Chrysler contends that beginning in that year, under pressure from Government antitrust litigation, National began to systematically sell its medallions to various New York City taxicab fleet operators. However, as a condition to the sale of its medallions, Checker would require the medallion purchaser to replace its entire fleet for the year with its taxicabs. By 1964, Checker had parted with the last of its 1,600 medallions with a resulting loss of this weapon for maintenance of its sales of taxicabs in New York. Moreover, Chrysler points to facts indicating that Checker's president, Morris Markin, has contributed to the company's loss of New York City sales by antagonizing that city's taxicab fleet owners over the years through public statements in favor of higher wages for taxi drivers and against increases in cab fares.

█ Even if it is assumed that the plan resulted in Chrysler dealers taking away sales from Checker, it is doubtful whether this is a permissible consideration, in the absence of a showing of predatory tactics, such as sales below cost or a scheme to squeeze Checker out of the market in order to destroy its competition and have it to themselves, since the purpose of the Sherman Act is to protect competition, not competitors. Ben Hur Coal Co. v. Wells, 242 F.2d 481, 486

(10th Cir.), cert. denied, 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1427 (1957). See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 220–221, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). The inevitable result of lawful price competition, particularly in an inelastic market with a fixed ceiling on the number of units that can be sold (such as New York City, which limits taxicabs to approximately 12,000), is that some sellers are going to take away business from others, unless all sell the identical product at the same price. Thus, if Chrysler were to have reduced its wholesale prices by $183, a move the legality of which would probably not be successfully challengeable, the effect on plaintif's share of the market might well be substantially the same.

Even if we assume proof of Checker's market loss to be relevant as some evidence of injury to competition in a market where few sellers are involved, genuine issues are raised by opposing affidavits to the effect that Checker's losses are due not to Chrysler's conduct but to inferior design and workmanship in Checker cabs, purchasers' difficulties in obtaining proper service, higher operational costs to taxicab owners, the expiration of restrictions requiring purchasers of medallions (from National Transportation) to buy Checker cabs, and Markins' alleged antagonizing of New York taxicab buyers by his sponsorship of a law increasing the total number of New York City medallions and his opposition to fare increases.

Chrysler further contends that its Rebate Plan has had the effect of promoting competition among competing taxicab manufacturers rather than inhibiting such competition, and states that Ford and General Motors have put into effect subsidies, rebates, other cash inducements and depreciation plans to retail taxi purchasers that are the equivalent of Chrysler's plan. Against this contention is the possibility (neither suggested by Checker nor supported by any proof) that the rebate may foreclose price negotiations and haggling between Chrysler dealers and taxicab purchasers with respect to the deduction from Chrysler's suggested list price that would be made if Chrysler had granted a straight $183 price reduction to its dealer instead of an automatic rebate directly to the purchaser. While such negotiations could result in the buyer's paying a higher net price than he would with an automatic $183 rebate in those instances where dealers chose not to pass the entire reduction along to their customers, this hardly indicates that competition is adversely affected by the Rebate Plan, the effect of which appears to be to increase interbrand competition among taxicab manufacturers, including Ford and General Motors, to a greater degree than would have been the case had Chrysler simply reduced its prices to dealers.

In view of the apparent benefit to competition from the Rebate Plan, and the speculative nature of any possible detriments, Checker's motion, insofar as it attacks the Rebate Plan under § 1 of the Sherman Act, must be denied, and a determination as to the plan's legality should await trial.

*The § 2(a), Robinson-Patman Act, Claim*

Checker next seeks summary judgment on the ground that the Rebate Plan was part of an unlawful primary line price discrimination between the sale of taxicabs and passenger automobiles which may substantially lessen competition in the sale of taxicabs, in violation of § 2(a) of the Robinson-Patman Act, 15 U.S. C.A. § 13(a).[5] Its theory is that Chrys-

5. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimina-

tion are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of

ler's taxicabs are in every respect either equal or superior in quality to its passenger cars, and that therefore, in the context of a price discrimination in favor of taxicabs, the two vehicles should be regarded as possessing "like grade and quality."

■■ In response to Checker's contention that the Rebate Plan caused an unlawful "price discrimination," i. e., a price difference, FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 549, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960), between taxicab purchasers and passenger car buyers, Chrysler argues that since Checker has not come forward with any evidence as to the retail prices at which the two vehicles are sold, price discrimination in violation of § 2(a) has not been shown. While a rebate may be violative of the Robinson-Patman Act, it is elementary that some proof indicating that it may result in discriminatory prices must be adduced. American News Co. v. FTC, 300 F.2d 104 (2d Cir. 1962) (Clark, J.), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962); Moog Industries, Inc. v. FTC, 238 F.2d 43 (8th Cir. 1956), affd., 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958). In the absence of any evidence as to retail prices of taxicabs and passenger cars, the Court cannot assume on this motion that except for the $183 rebate to taxicab buyers, the prices of taxicabs and passenger cars would be identical. Unlikely as it may be, it is possible that the $183 rebate results in identity of price to the two customer categories. Accordingly, resolution of the question must await trial, at which the prices of the two categories may be introduced.

Chrysler next contends that it could not in any event have violated the prohibitions of the Robinson-Patman Act, because the alleged price discrimination was not between different purchasers from the manufacturer, but only between purchasers from Chrysler's independently franchised dealers after the latter had purchased, paid for, and acquired ownership of the vehicles. Thus, Chrysler argues, it is not a person who discriminates in price "between different purchasers" as required by § 2(a). In reply, Checker invokes the "indirect purchaser" doctrine, American News Co. v. FTC, 300 F.2d 104, 109 (2d Cir.), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed. 2d 64 (1962), as the basis for urging that retail purchasers of taxicabs and passenger vehicles from Chrysler's franchised dealers are "purchasers" from Chrysler, within the meaning of § 2(a).

■ The application of the "indirect purchaser" doctrine to a particular case depends upon showing that the manufacturer deals directly with the alleged "purchaser" and "controls the terms upon which he buys." American News Co. v. FTC, 300 F.2d at 109; K. S. Corp. v. Chemstrand Corp., 198 F.Supp. 310, 312–313 (S.D.N.Y.1961); Purolator Prods., Inc. v. FTC, 352 F.2d 874 (7th Cir. 1965), cert. denied, 389 U.S. 1045, 88 S. Ct. 758, 19 L.Ed.2d 837 (1968).

"The 'customer' or 'purchaser' requirement marks one of the outer limits of the seller's responsibility not to discriminate. As long as he exercises control over the terms of a transaction he is held to this duty; otherwise the requirement of the statute could be easily avoided by the use of a 'dummy' wholesaler. If there is no control the duty naturally ends, for the manufacturer has no power to protect the buyer's competitors." (American News Co. v. FTC, 300 F.2d at 109–110)

The Supreme Court has recently given added vitality to the doctrine by eliminating the direct dealing and control requirements with respect to the disfavored "indirect purchaser" where the defendant has engaged in direct sales to the favored purchaser. FTC v. Fred Meyer,

such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent

competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them."

Inc., 390 U.S. 341, 88 S.Ct. 904, 19 L. Ed.2d 1222 (1968). However, the *Meyer* Court did not question the *American News* test as applied to the situation in which "a supplier in effect supplants his intermediate distributors in dealings with those to whom the distributors resell and favors some the [sic] distributors' accounts over others." 88 S.Ct. 910.

In the present case Chrysler suggests the resale price at which its dealers resell taxicabs and passenger cars, and engages in advertising campaigns to promote the sale of its vehicles to the public. With respect to the rebate, Chrysler not only sets the amount of the rebate, but also unilaterally controls the terms and conditions under which it is granted, receives the completed form, and pays the rebate directly to the taxi purchaser. However, the dealer is free to negotiate the ultimate price with his customer, offsetting the $183 rebate if he desires, and in fact appears to deviate from the manufacturer's resale price in making his sales. Further, with the exception of the rebate, Chrysler has no direct personal relationship with the taxi purchaser. In *American News,* as distinguished from the situation before us, the seller not only gave rebates to the favored indirect purchaser but also fixed the prices, terms, and conditions of sale. In Purolator Prods., Inc. v. FTC, 352 F.2d 874 (7th Cir. 1965), cert. denied, 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837 (1968), the Court, accepting and applying the test of manufacturer control of the terms of resale, upheld a finding of an "indirect purchaser" relationship based on evidence that the manufacturer (1) had at one time had the legal right to control independent warehouse distributor sales; (2) had supplied warehouse distributors with their sales agreements and suggested resale price lists; (3) had solicited the indirect purchasers (the jobbers) and urged them to maintain prices which for the most part they had done; and (4) had directly negotiated franchise agreements and changes in price with the indirect purchasers. See Joseph A. Kaplan & Sons, Inc. v. FTC, 121 U.S. App.D.C. 1, 347 F.2d 785 (1965).

In this case the papers reveal a sharp issue as to whether Chrysler exercised sufficient control over the terms and conditions of its dealers' resales of passenger cars and taxicabs to warrant a determination that the dealers' customers were Chrysler's "indirect purchasers." Since the resolution of that issue hinges upon the number and quality of contacts between the manufacturer and the alleged indirect purchaser, it must await trial. K. S. Corp. v. Chemstrand Corp., 198 F.Supp. 310, 313 (S.D. N.Y.1961). On the other hand, Chrysler's contention that the "indirect purchaser" doctrine does not apply to a case where the indirect purchasers are consumers rather than retailers must be rejected as frivolous, being unsupported by the underlying purposes of the doctrine.

Chrysler next challenges the proposition that its taxicabs and its passenger cars are of "like grade and quality." In Atlanta Trading Corp. v. FTC, 258 F.2d 365 (2d Cir. 1958), the Second Circuit held that Canadian bacon, ham and pork shoulders were not of "like grade and quality" reasoning as follows:

"The test of products of like grade and quality was evolved to prevent emasculation of the section by a supplier's making artificial distinctions in his product but this does not mean that all distinctions are to be disregarded. Such a holding would lead to the conclusion that all articles of food are competitive, each with the other—an obvious absurdity. Merely because various articles of food are derived from a common source (in this case, the pig), should not force the vendor of a broad line of such products to market or promote all simultaneously and in an identical fashion. The dietetic habits of the consuming public are not to be controlled by judicial fiat." (258 F.2d at 371)

However, cross-elasticity of demand, substitutability, physical appearance, and identity of performance, are factors to

be considered in determining whether goods are of "like grade and quality." From the moving papers, a number of differences between Chrysler's passenger cars and taxicabs appear. The former contains more chrome; more attractive paint; seat covers that are aesthetically more desirable to purchasers of passenger cars; and various mechanical differences related to the type of driving normally undertaken by taxi drivers and passenger car drivers. Although it seems clear that denominating one vehicle a "taxicab" and an identical one a "passenger car" will not preclude a finding of "like grade and quality," FTC v. Borden Co., 383 U.S. 637, 86 S. Ct. 1092, 16 L.Ed.2d 153 (1966), if there are substantial physical differences in products affecting consumer use, preference or marketability, such products are not of "like grade and quality," regardless of manufacturing costs. *Quaker Oats Co.*, 1963–65 FTC Complaints, Orders, Stipulations ¶ 17,134 (1964). See generally, Comment, Like Grade and Quality: Emergence of the Commercial Standard, 26 Ohio State L.J. 294 (1965). The existence of some physical differences between Chrysler taxicabs and passenger cars, coupled with conflicting contentions as to their effect upon cross-elasticity of use, precludes application of the principle that mere differences between "standard" and "premium" brands are insufficient to render them different in grade and quality. E. g., E. B. Muller & Co. v. FTC, 142 F.2d 511 (6th Cir. 1944). Whether the differences between Chrysler's taxicabs and passenger cars are minor and unsubstantial (as claimed by Checker) or substantial enough to affect consumer use, preference or marketability, presents a genuine issue of fact which cannot properly be resolved upon this motion for summary judgment. United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962);

Gordon v. Vincent Youmans, Inc., 358 F.2d 261 (2d Cir. 1965).

 Chrysler challenges the proposition that buyers of taxicab and passenger cars are "purchasers" entitled to equal treatment within the meaning of § 2(a). Its theory is that the Robinson-Patman Act was never intended to place the users of passenger cars for pleasure purposes on a par with those who use their automobiles to earn their livelihood, e. g., taxicab owners. However, even if it were agreed that all passenger car owners use their vehicles solely for pleasure, this contention erroneously assumes that § 2(a) was designed to protect only competing purchasers. That section also protects sellers competing against the grantor of the discriminatory price. The mere fact that the favored and disfavored purchasers are not in competition *inter se* does not preclude a Robinson-Patman violation in a primary line case. See Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967); FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960). Moreover, a secondary line case, FTC v. Borden Co., 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966), holds that a seller cannot discriminate between prices charged by it for nationally advertised and private brands where the goods contained in each are of "like grade and quality." *Borden* implicitly assumes that the mere fact that one class of purchasers are more aware of market conditions and more knowledgeable of the product's qualities does not justify a price discrimination against a class that is without this information. Therefore, the contention made by Chrysler must be rejected.

 Chrysler alleges that its Rebate Plan falls within § 2(b)'s "good faith meeting competition" defense, 15 U.S.C. § 13(b),[6] because Ford and Gen-

---

6. *"Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

eral Motors offer rebates equal to or in excess of $183 in the sale of their taxicabs. However, one of the requirements of this defense is that the seller demonstrate that his reduced price was to meet a competitor's equally low price. See FTC v. Sun Oil Co., 371 U.S. 505, 514–515, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). Chrysler's plan was begun in 1962. Its affidavits and exhibits tend to show that Ford and General Motors did not commence their rebate arrangements until sometime during or after 1964. Since Chrysler, which has the burden on this issue, FTC v. Sun Oil Co., 371 U.S. at 514, 83 S.Ct. 358, has not demonstrated that its Rebate Plan was introduced in response to a rival's rebate scheme, it cannot assert the § 2(b) defense as a basis for summary judgment in its favor.

Chrysler next asserts that because its Rebate Plan was carried out on a nationwide basis and Checker is a manufacturer selling taxicabs to customers in several other cities, the entire United States, rather than New York, is the relevant market in which to appraise the injury to competition involved in this case. Without attempting to bind the trial court to a market definition that inevitably necessitates a detailed probative analysis of the underlying economic data, FTC v. Sun Oil Co., 371 U.S. 505, 527, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963); Reines Distributors, Inc. v. Admiral Corp., 5 CCH Trade Reg. Rep. ¶ 72,151, p. 84,145 (S.D.N.Y.1967); see Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 330–333, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), the papers submitted indicate that New York City is a separate and distinct market.

With respect to the question of whether the effect of the alleged discrimination may have been "substantially to lessen competition," the Court has already alluded (supra pp. 884–885) to the parties' conflicting contentions as to the cause of Checker's loss of sales and taxicab registrations in New York City which cannot be resolved on this motion and must await trial. For the same reasons it is unnecessary at this stage to pass upon Chrysler's contention that the alleged discrimination was not made in the course of interstate commerce as required by § 2(a) and that the case involves only intrastate sales by franchise dealers to purchasers within the state. Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943); Burke v. Ford, 377 F.2d 901 (10th Cir. 1967).

*Preliminary Injunctive Relief*

Since the factual issues raised with respect to both the Sherman Act and Robinson-Patman Act claims on this motion raise a serious doubt as to whether Checker will ultimately prevail, preliminary injunctive relief must be denied. Clairol, Inc. v. Gillette Co., 389 F.2d 264 (2d Cir. 1968). Furthermore, a review of the hardships and equities does not disclose a balance favoring injunctive relief. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 743 (2d Cir. 1953); Blaich v. National Football League, 212 F.Supp. 319, 322–324 (S.D. N.Y.1962). In addition, the antitrust laws afford plaintiff treble damage relief for any loss sustained as a result of Chrysler's unlawful conduct. Since any drop in Checker taxicab sales caused by continuation of the Rebate Plan is capable of fairly precise measurement, it will not suffer irreparable harm from the denial of relief. See FMC v. Atlantic & Gulf/Panama Canal Zone, 241 F.Supp. 766, 780–781 (S.D.N.Y.1965).

In the light of all of the above considerations, see Perry v. Perry, 88 U.S.App. D.C. 337, 190 F.2d 601, 602 (1951) (Bazelon, J.), Checker is not entitled to preliminary injunctive relief.

So ordered.